EFiled: Feb 26 2016 03:38PM EST
Transaction ID 58637406
Case No. 7369-VCN

COURT OF CHANCERY
OF THE
STATE OF DELAWARE

JOHN W. NOBLE
VICE CHANCELLOR

417 SOUTH STATE STREET
DOVER, DELAWARE 19901
TELEPHONE: (302) 739-4397
FACSIMILE: (302) 739-6179

February 26, 2016

R. Judson Scaggs, Jr., Esquire
Dustin B. Hillsley, Esquire
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
Wilmington, DE 19801

Raymond J. DiCamillo, Esquire
Kevin M. Gallagher, Esquire
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, DE 19801

Re: *Cyber Holding LLC v. CyberCore Holding, Inc.*
C.A. No. 7369-VCN
Date Submitted: November 10, 2015

Dear Counsel:

Plaintiff Cyber Holding LLC (the "Seller") sold CyberCore Corporation (the "Company") to Defendant CyberCore Holding, Inc. (the "Buyer") in 2011 in accordance with the Redemption and Stock Purchase Agreement (the "Agreement").[1] The parties, before entering into the Agreement, understood that significant change-of-control payments and professional fees would be incurred

---

[1] The Agreement is Joint Trial Exhibit ("JX __") 1. Seller is an affiliate of Roark Capital Group ("Roark"), which was the Company's majority stockholder and, for purposes of this proceeding, is the representative of other former stockholders of the Company. Agreement § 11.16. References to the "Seller" in the singular sometimes include all of the Company's selling stockholders. Buyer is an affiliate of Moelis Capital Partners Opportunity Fund I, L.P. ("Moelis").

and those expenses would reduce the Company's tax liability (the "Transaction Deductions"). The Agreement contains provisions relating to the tax consequences of the Transaction Deductions. The Transaction Deductions for the Company's benefit claimed by the Seller included (a) a substantial net operating loss ("NOL") carryback refund for 2009 and 2010 tax years; (b) a refund of the prepaid estimated taxes for the 2011 Stub Year[2]; and (c) a reduction of Stub Year taxes.

Seller asserts that Buyer breached the Agreement by not paying to it the full value of the tax savings. The Transaction Deductions at issue reduced the Company's tax liability for the Stub Year by $1,557,171 (the "Avoided Tax").[3] Federal income tax savings were $1,319,954 and Maryland income tax savings were $451,383. As a result, the Company had no income tax liability for the Stub Year. In addition, an overpayment of federal income taxes for 2010 was credited as estimated tax for 2011; that was refunded because of the Transaction Deductions and, in accordance with the Agreement, was paid to the Seller. Also,

---

[2] The Buyer and the Company elected to file a consolidated 2011 tax return and the Company's 2011 tax year ended on July 8, 2011, the day the transaction closed (the "Stub Year"). Revised Joint Pretrial Stipulation ("Stip.") ¶ II.3.

[3] Stip. ¶ II.4–7.

NOL carrybacks for 2009 and 2010 provided the Company with state and federal income tax refunds of $3,576,406, which were paid to the Seller.

Each party has argued that the Agreement entitles it to the Avoided Tax. The Court, in connection with cross-motions for summary judgment, concluded that each had proffered a reasonable reading of the Agreement and, thus, that ambiguity precluded summary judgment.[4] With that determination, the Court considers extrinsic evidence. Of course, the simple fact that the Agreement is "fairly susceptible to at least two reasonable interpretations,"[5] does not exclude the possibility that one reading of the Agreement is, on the basis of its text, a substantially more compelling interpretation.

This letter opinion sets forth the Court's post-trial findings of fact and conclusions of law.

The parties do not disagree about the legal principles guiding the Court in this effort. Delaware law, with its commitment to the objective theory of contract construction, requires the Court to construe the Agreement according to the

---

[4] *Cyber Hldg. LLC v. CyberCore Hldg., Inc.*, 2015 WL 4227098 at *3 (Del. Ch. July 9, 2015).

[5] *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007).

meaning "which would be understood by an objective, reasonable third party."[6] The search is for that "objectively reasonable meaning."[7] The Court must be careful to assess the Agreement, at least to the extent possible, "as a whole and . . . give each provision and term effect, so as not to render any part of the contract mere surplusage."[8] The Court considers extrinsic evidence in an effort "to ascertain the shared intentions of the parties."[9] The parties have offered extrinsic evidence regarding pre-signing negotiations, the drafting history of critical provisions in the Agreement, and the structure and context of the Agreement.

In early 2011, the Company was offered for sale through an auction process; interested parties were provided a draft of the Agreement. The Buyer proved to be the most viable prospective purchaser and negotiations commenced. This dispute

---

[6] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (quoting *NBC Universal v. Paxson Commc'ns*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)).

[7] *See United Rentals, Inc.*, 937 A.2d at 835 (internal quotation marks omitted) (quoting *U.S. W. v. Time Warner, Inc.*, 1996 WL 307445, at *10 (Del. Ch. June 6, 1996)).

[8] *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010).

[9] *United Rentals, Inc.*, 937 A.2d at 834 (quoting *W. Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC*, 2007 WL 3317551, at *9 (Del. Ch. Nov. 2, 2007)).

centers on provisions regarding the Transaction Deductions. Because these concerns were tax driven,[10] the primary negotiators on these topics were tax lawyers: Wayne Pressgrove, Esq. for Seller and Kenneth Tillou, Esq. for Buyer.[11]

Both sides anticipated that the Transaction Deductions would be significant; likely more than $10 million and likely causing a sizeable reduction in the Company's tax liability.[12]

Only a few provisions in the Agreement can help the Court glean the parties' intent with respect to the allocation of the benefits derived from the Transaction Deductions.

The parties' debate necessarily focuses on Section 6.5(f)(z) which provides in pertinent part:

> To the extent . . . (z) Transaction Deductions claimed in the Tax year ending on or including the Closing Date result in a reduction of Taxes for that Tax year in excess of the amount paid to Sellers pursuant to Sections 6.5(d) and (e), then Buyer shall utilize such deductions . . . as fully and quickly as possible and shall pay to the [Sellers] an amount equal to the amount by which (i) the amount of Taxes that the Buyer, the Company and its Subsidiaries (or their successors) would have

---

[10] The most significant provision in the Agreement for present purposes is Section 6.5 which carries a heading of "Tax Matters."

[11] Tr. at 101 (Pressgrove); Tr. at 225 (Tillou).

[12] Tr. at 17 (Field); Tr. at 321–22 (Tillou).

> been required to pay in the Tax year in question but for the deduction . . . exceeds (ii) the amount of Taxes actually payable by the Buyer, the Company and its Subsidiaries (or their successors) with respect to such Tax years (and in the case of payments pursuant to clause (z) above, solely to the extent such amount is in excess of the amount paid to Sellers pursuant to Sections 6.5(d) and (e)).  Buyer shall make such payments within fifteen (15) days of filing the applicable Tax Returns for each such Tax year to the extent of the excess for such Tax year.[13]

Fundamentally, this provision allocates to the Seller tax savings based on the Transaction Deductions.  There are limitations on the amounts to be paid, however. The Agreement provides that the amount to be paid cannot exceed the amounts paid under Section 6.5(d) and Section 6.5(e), which would be the benefits from the NOL carrybacks to Tax years 2009 and 2010 and the refund of prepaid estimated taxes for the Stub Year.  The tax benefits of the NOL carrybacks exceeded the amount of tax savings for the Transaction Deductions in the Stub Year.  This case turns on whether the reference to amounts paid under Sections 6.5(d) and (e) is with respect to all amounts paid regardless of the tax year or just those that are allocated to 2011 (*i.e.*, the Stub Year).

---

[13] The reference to "Tax year ending on or including the Closing Date" is to the Stub Year.

Even though both sides appreciated the significance of the Transaction Deductions, only three conversations on this topic have been identified. On May 23, 2011 (or within a few days), Tillou and Ray Baltz, Esq. a partner of Pressgrove and the principal lawyer on the transaction for the Seller, talked about a change to Section 10.1 proposed by Buyer. That change was made to allocate liability for pre-closing taxes to Seller. Later that day, during a conference call with several participants, Tillou argued that Section 6.5(f)(z) was inconsistent with Section 10.1, as revised, and thus should be deleted. Without discussion, that proposal was rejected.

On June 7, 2011, the day before closing, Pressgrove and Tillou had a short conversation. As it turns out, it might have been a good idea to have had a longer call. Seller and Buyer both point out what was not said, but a discussion about one specific provision the day before a transaction closes will sometimes necessarily be focused only on that specific topic, without delving into possible collateral consequences.

Tillou reiterated his view that Section 6.5(f)(z) was inconsistent with Section 10.1(a)(iii)'s allocation of pre-closing tax liability to Seller.[14] Pressgrove saw no inconsistency because there would be no income taxes as a result of the Transaction Deductions. He told this to Tillou and took the position that removal of Section 6.5(f)(z) was nonnegotiable because it had been in the Agreement since its earliest draft. The call ended with Tillou's stating that he understood Pressgrove's position and that if he did not call back, Pressgrove should consider the request to remove Section 6.5(f)(z) abandoned. Tillou did not call back.[15]

Buyer observes that Tillou never expressed agreement with Pressgrove's reading; that Pressgrove never stated that Section 6.5(f)'s offsets were limited to the Stub Year; that Section 6.5 made Buyer responsible for pre-closing taxes; that Seller expected a cash benefit from the Transaction Deductions used for the Stub Year; or that Section 6.5(e) covered the estimated taxes. Seller, on the other hand, points out that Tillou did not disagree with Seller's view that Section 6.5(f)(z) required payment of the Avoided Tax. Tillou, after the "will call back if there is a

---

[14] Tr. at 270–71 (Tillou). Tillou sought removal of Section 6.5(f)(z) on several occasions. Tr. at 242, 318–19, 364–65 (Tillou).
[15] Tr. at 278 (Tillou).

problem" conversation, confirmed that there were no issues in the way of closing.[16]

Also Tillou never offered during the June 7 conversation that the text of Section 6.5(f)(z) that reduces payment under that Section because of certain refunds pursuant to Sections 6.5(d) and 6.5(e) would also involve refunds attributable to NOLs carried back to prior years or a refund of estimated taxes paid in the Stub Year.

Based largely on these conversations, the parties each sponsor a contract interpretation principle to bolster their contentions. First, Seller invokes the "forthright negotiator principle" which allows the Court to adopt "the subjective understanding of one party that has been objectively manifested and is known, or should be known by the other party."[17] Tillou understood that Pressgrove expected Buyer to pay the Avoided Tax to Seller and that Seller had "priced it" into its economic assessment of the possible sale.[18]

---

[16] Tr. at 136 (Pressgrove); Tr. at 272, 353–54 (Tillou).
[17] *United Rentals, Inc.*, 937 A.2d at 836.
[18] Tr. at 275–76, 345 (Tillou).

Tillou had been prompted to talk with Pressgrove the evening before the transaction closed by an investor who was concerned that Section 6.5(f)(z) might be read as the Seller now contends.[19] Tillou did not read the provision the same way, and his efforts were designed to clarify the textual tension. Perhaps he could have been clearer or more precise during his short conversation with Pressgrove, but the record does not support a finding of the type of disingenuous (or worse) conduct that is the foundation for the forthright negotiator principle. Tillou's parting comment that Pressgrove should consider the request for revision withdrawn if Tillou did not "call back" was, at least with the benefit of hindsight, ambiguous. Pressgrove may have viewed the absence of a "call back" as an agreement with his reading.[20] Alternatively, it may have been the functional equivalent of an "agreement to disagree." Sometimes, parties enter into contracts with different expectations. Parties can accept words as a manifestation of their agreement while recognizing that, depending upon what happens during the course of contract performance, there may be disagreements later about the meaning of

---

[19] Tr. at 347 (Tillou).
[20] Tr. at 136 (Pressgrove); Tr. at 272 (Tillou).

those words. In short, Tillou's conduct does not warrant application of the forthright negotiator principle.

Buyer invokes the doctrine of *contra proferentem* and asks the Court to construe the Agreement against the Seller as the drafting party. The Court declines Buyer's invitation. First, the parties expressly agreed not to use this doctrine. "This Agreement shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if all Parties had prepared it."[21] Second, sophisticated parties of substantially equal bargaining power negotiated the Agreement, including Section 6.5(f)(z). That a party takes a firm position—as Pressgrove did—does not create the oppressiveness or unfair circumstances that the *contra proferentem* doctrine was designed to address, especially in light of Buyer's sophistication and bargaining strength.[22]

---

[21] Agreement § 1.3(c).

[22] *See, e.g.*, *Wilm. Firefighters Ass'n, Local 1590 v. City of Wilm.*, 2002 WL 418032, at \*10 (Del. Ch. Mar. 12, 2002).

The Court now turns to the substance of the parties' contractual dispute. At the heart of the dispute is whether the offset of Section 6.5(f)(z) is limited to the 2011 Tax year (*i.e.*, the Stub Year). Seller tries to limit the offset to the Stub Year, while Buyer tries to include the 2009 and 2010 NOL carrybacks.

In general, Buyer is obligated to use the Transaction Deductions and pay to Seller the difference between the tax the Company would have been required to pay, but for the Transaction Deductions, and the amount actually paid. Two clauses in Section 6.5(f) arguably limit the amount which is to be paid to Seller. First, is the initial "condition": "To the extent . . . Transaction Deductions claimed in the [Stub Year] result in a reduction of taxes for that Tax year in excess of the amount paid to Sellers pursuant to Sections 6.5(d) and (e)." Second, the "operative" language of Section 6.5(f)(z) also limits payments under that Section by providing that an initially calculated sum is payable "solely to the extent such amount is in excess of the amount paid to Sellers pursuant to Sections 6.5(d) and (e)." If the offset attributable to payments under Sections 6.5(d) and 6.5(e) is limited to those in a particular year, Seller prevails; if payments under

Sections 6.5(d) and 6.5(e), without regard to the year of the benefits, comprise the offset, then Buyer would prevail.

Buyer has paid Seller approximately $3.79 million for estimated tax refunds and NOL-carryback generated refunds in accordance with Sections 6.5(d) and 6.5(e). This amount exceeds the Avoided Tax. According to Buyer, the Avoided Tax payment sought by Seller is "in excess of the amount paid . . . pursuant to Sections 6.5(d) and (e)" and, thus, need not be paid. The question is whether the offset is limited to the Stub Year or also includes refunds for 2009 and 2010 taxes. Buyer asserts in substance that Seller is entitled to payment under Section 6.5(f)(z) only if the Transaction Deductions generate tax savings for 2011 that are greater than all payments under Section 6.5(d) and Section 6.5(e) for all years. Seller contends that the only offset applicable to the Stub Year is for the refund of proposed estimated taxes.

Section 6.5(f)(z) makes reference to the "Tax year ending on or including the Closing Date,"[23] and to the same tax year through the use of similar language such as "for that Tax year" or "in the Tax year in question" or "excess for such Tax

---

[23] As noted, that would be the Stub Year of 2011.

year." Even though the limiting clause of Section 6.5(f)(z) does not expressly limit the offset to any particular tax year, the Court concludes that the better reading is that the parties intended to limit the exclusion provision temporally to the tax year in which the tax savings are applied—in this instance, the Stub Year. The "Tax year[s] in question" when the NOL carrybacks were used to refigure tax liability were 2009 and 2010, not the Stub Year of 2011.

The Court also concludes that, to the extent that it is helpful, the extrinsic evidence supports this reading. The parties knew, before entering into the Agreement, that the total of payments under Section 6.5(d) and 6.5(e) for all years would exceed the Avoided Tax. Thus, if Buyer was convinced that the NOL carryback refunds were included in the offset provision of Section 6.5(f)(z), it would have recognized that Section 6.5(f)(z) would never have been triggered and any discussions regarding that provision would have served little purpose. Indeed, Buyer has offered no logical explanation for why 2009 and 2010 carryback refunds would be an offset to 2011 tax savings. Although parties are not required to support their reading of a contract with a logical basis, courts should not aspire to an illogical interpretation, unless that accurately incorporates the parties' intent.

One objective here might be avoiding a double counting by reducing the 2011 tax savings payment by an amount equal to the estimated tax refunds (as already accounted for) for the Stub Year. Moreover, the Seller endured the economic consequences associated with the Transaction Deductions which were generally subtracted from the purchase price.[24] Thus, there is a solid policy reason for allocating the benefit of the Transaction Deductions—which include the Avoided Tax—to Seller.[25]

Buyer is not without arguments that carry some validity. Some of its arguments are better than others.

Buyer characterizes Seller's contentions as rewriting the limitation of refunds to the extent they are in excess of the amounts paid under Sections 6.5(d) and (e) to, in substance, a limitation of refunds to the amount in excess of 2011 estimated tax refunds. Buyer contends that this reading deprives Section 6.5(d) of any meaning or purpose. Seller's analysis is helped if both Sections 6.5(d) and

---

[24] Tr. at 322 (Tillou).

[25] According to Pressgrove, this allocation is common in comparable transactions. Tr. at 122–23 (Pressgrove) ("[I]t's almost always the case that the sellers get [the value of the transaction deductions] because they're the ones economically bearing the expenses that give rise to the deductions.").

6.5(e) can be read to deal with prepaid estimated taxes in different contexts.[26]

Although Section 6.5(d) more clearly addresses prepaid estimated taxes, Section 6.5(e) applies if the Transaction Deductions eliminate all tax liability for the Stub Year, thereby creating an NOL. That is what happened here.[27] Section 6.5(d) would have applied if the Transaction Deductions had reduced (but did not eliminate) the Company's taxable income for the Stub Year. In other words, if the Stub Year tax liability had been less than the prepaid estimated taxes (but still a positive number), Section 6.5(d) would have allocated the net savings (*i.e.*, some but not all of the prepaid estimated taxes) to the Seller.

Buyer persuasively argues that the text of Section 6.5(e) precludes its application to estimated tax refunds:

> Within five Business Days of the receipt . . . of a refund as a result of such a refund claim, Buyer shall pay to the Sellers' Representative . . . an amount equal to (i) the amount by which (A) the amount of the refund actually received exceeds (B) the amount of the refund that would have been received had the refund been determined without taking into account any Deductible Expense Carrybacks . . . .

---

[26] When it filed this action, Roark identified only Section 6.5(d) as the basis for a payment of the estimated tax refund. Verified Compl. ¶ 17.

[27] Section 6.5(e) refers to IRS Form 4466 which is for overpayment of estimated taxes.

A deductible expense carryback would not involve estimated tax refunds for the Stub Year and, thus, there is no logical way to bring a payment based on an estimated tax refund within the scope of Section 6.5(e).[28]

The Transaction Deductions created a "net operating loss for the [Stub Year]," and it is Section 6.5(e) that allows the carryback of NOLs to tax years 2009 and 2010. The language quoted from the end of Section 6.5(e) can be read as applying to the carryback, which has already resulted in a significant payment to Seller. Interpreting how to account for the estimated tax refund can readily be accomplished within the context of 6.5(e), when necessary.

The Buyer also argues that the Transaction Deductions reduced Roark's tax obligations and not Moelis's tax obligations and, thus, no payment would be due under Section 6.5(f). This argument starts with a fundamental principle that the basis for allocation of tax liabilities was that the Seller controlled the Company before the Closing Date and thus would be liable for taxes incurred before the Closing Date. By Section 10.1(a)(iii):

---

[28] Even Pressgrove admits that different language should have been used. Tr. at 146–47 (Pressgrove).

> [Sellers] shall severally . . . indemnify and hold harmless . . . each of the Buyer Indemnified Parties from, against and in respect of any and all Losses arising out of . . . any Taxes assessed or imposed upon the Company or any Company Subsidiary that are allocable or attributable to taxable years or periods ending on or prior to the Closing Date . . . .

The difficulty with this argument is that Section 6.5(a) appears to make the Buyer responsible for 2011 taxes. It provides:

> Buyer shall, at its own expense, prepare or cause to be prepared and timely file or cause to be timely filed all Tax Returns of the Company and the Company Subsidiaries for all periods beginning on or after January 1, 2010 that have not yet been filed and are required to be filed after the Closing Date. . . . Buyer shall cause any amounts shown to be due on such Tax Returns (other than estimated tax payments due prior to the Closing Date) to be timely remitted to the applicable Governmental Entity . . . .

The debate about who is responsible for Stub Year taxes is an interesting one because all parties understood that there would be no taxes for the Stub Year because of the Transaction Deductions. Regardless of who was responsible for payment of the 2011 taxes, Buyer still owes Seller the amount by which the Transaction Deductions reduced the Company's 2011 tax liability. The question is not limited to the Buyer's tax liability but also includes any reduction in the Company's tax liability. Section 6.5(f)(z) refers to a payment to the extent taxes of

"Buyer, the Company and its subsidiaries (or their successors)" are reduced. Thus, the debate about whether the taxes are Roark's problem or Moelis's problem overlooks the contractual reality that the focus should be on the Company's tax liability. Obviously, at one point the Company's tax liability was largely a Roark problem and, at another point, the Company's tax liability was largely a Moelis problem.

The Court's challenge is to ascertain the intent of the parties as expressed in the Agreement, an effort which may now benefit from extrinsic evidence. The search is for the overall or entire agreement. That some words or provisions of the Agreement can be read to suggest a different outcome is not controlling.[29] Contract principles that guide the Court—such as the tenet that all provisions of an agreement should be given meaning[30]—do not necessarily drive the outcome. Sometimes apparently conflicting provisions can be reconciled, but in order to prevail on a contract claim a party is not always required to persuade the Court that its position is supported by every provision or collection of words in the

---

[29] Seller is the plaintiff. In order to prevail, it must satisfy the preponderance of the evidence standard.

[30] *Kuhn Constr., Inc.*, 990 A.2d 396–97.

agreement. Such pervasive success may be what a party aspires to achieve and such success may make the Court's task easier, but it is not essential. Here, the better reading—even if it is with provisions that are difficult to reconcile—favors payment of the Avoided Tax to Seller without offset and that conclusion is also supported to some extent by the extrinsic evidence. In short, "[t]he meaning inferred from a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan."[31] The "meaning of the entire agreement," or perhaps more accurately, the meaning of the Tax Matters provision (Section 6.5) of the Agreement supports Seller's claim. Thus, Buyer owes Seller the Avoided Tax.

Seller's effort to demonstrate a right to specific performance falters because its position, both factually and legally, does not qualify as clear and convincing and notwithstanding the parties' agreement with respect to an adequate remedy at law,[32] there obviously is an adequate remedy at law—the award of damages as the

---

[31] *GMG Capital Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012).

[32] *See* Agreement § 11.10 ("[E]ach Party shall be entitled to enforce the terms of this Agreement by a decree of specific performance without the necessity of proving the inadequacy of money damages as a remedy.").

Court now implements.[33] Because Seller is entitled to an award of damages, the question of prejudgment interest must be addressed.

Seller asked Buyer to pay the Avoided Tax (the amount by which the Transaction Deductions reduced 2011 tax liability) in early 2012.[34] Buyer clearly informed Seller on February 3, 2012, that it would not pay in accordance with the demand.[35] Ordinarily, prejudgment interest would run from this date, which is the date of Buyer's breach.

Buyer, however, relies upon Section 10.3(c) of the Agreement to argue that no prejudgment interest is due. The Agreement provides:

> As promptly as possible after the Indemnified Party has given [notice of a claim to a right to payment pursuant to the Agreement], such Indemnified Party [in this instance, Seller] and the appropriate Indemnifying Party [in this instance, Buyer] shall establish the merits and amount of such claim (by mutual agreement, arbitration, litigation [as was done in this instance] or otherwise) and, within five (5) Business Days of the final determination of the merits and amount of

---

[33] Parties to a contract cannot deprive a court of equity of its discretion with respect to an award of an equitable remedy, especially where a remedy at law is readily available. The provision might preclude a party to the contract from contesting the power of equity, but that is not the issue posed by this provision.

[34] The amount sought by Seller was later adjusted, but the difference is not at issue here.

[35] JX 10.

> such claim, the Indemnified Party shall . . . [pay] in an amount equal to such claim as determined hereunder, if any.

Thus, payment of the Avoided Tax was not tied to a demand for it or resolution of an audit by taxing authorities.  Instead, it became due five days after the amount was established by, in this instance, litigation.  Seller argues that prejudgment interest is a matter of right,[36] but nothing precludes parties to a contract from agreeing to a different form of remedy.  Buyer and Seller agreed, at Section 10.6 of the Agreement, that:

> The provisions of [two articles and a section of the Agreement, one of which is the basis for the Seller's claim here] set forth the exclusive rights and remedies of the parties to seek or obtain damages or any other remedy or relief whatsoever from any party with respect to matters arising under or in connection with this Agreement and the transactions contemplated hereby.

Prejudgment interest is fairly considered "any other remedy or relief," even though neither Section 10.3(c) nor Section 10.6 mentions prejudgment interest.  Moreover, prejudgment interest runs from when payment is due.[37]  Here, the parties, for

---

[36] *See, e.g.*, *Citadel Hldg. Corp. v. Roven*, 603 A.2d 818, 826 (Del. 1992).

[37] *See, e.g.*, *E. Coast Plumbing & HVAC, Inc. v. Edge of the Woods, LP*, 2004 WL 2828286, at *5 (Del. Super. July 30, 2004).

whatever reason, agreed that payment would not be due (and did not need to be made) until the dispute over the amount to be paid was resolved.

Thus, Seller is not entitled to prejudgment interest.[38]

Accordingly, for the foregoing reasons, judgment will be entered in favor of Seller and against Buyer in the amount of $1,557,171, together with post-judgment interest at the legal rate.[39] An implementing order will be entered.

Very truly yours,

*/s/ **John W. Noble***

JWN/cap
cc:    Register in Chancery-K

---

[38] Buyer does not dispute Seller's entitlement, if it prevails, to post-judgment interest.

[39] *See* 6 *Del. C.* § 2301(a).