# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |  |  |
|---|---|---|---|
| AM BUYER LLC and | ) | | |
| AM INTERMEDIATE PARENT, INC., | ) | | |
| | ) | | |
| Plaintiffs, | ) | | |
| | ) | | |
| v. | ) | C.A. No. N23C-11-167 | |
| | ) | PRW CCLD | |
| ARGOSY INVESTMENT | ) | | |
| PARTNERS IV, L.P. and | ) | | |
| ANVIL CAPITAL PARTNERS III, L.P., | ) | | |
| | ) | | |
| Defendants. | ) | | |

Submitted: July 25, 2024
Decided: September 3, 2024

*Upon Defendants' Motion for Summary Judgment,*
**GRANTED in part, DENIED in part.**

*Upon Defendants' Request for Fees and Costs,*
**DENIED.**

## MEMORANDUM OPINION AND ORDER

David S. Eagle, Esquire, Sally E. Veghte, Esquire, KLEHR HARRISON HARVEY BRANZBURG LLP, Wilmington, Delaware; Bonita Stone, Esquire (*argued*), KATTEN MUCHIN ROSENMAN LLP, Chicago, Illinois, *Attorneys for Plaintiffs AM Buyer LLC and AM Intermediate Parent, Inc.*

Kelly E. Farnan, Esquire, Kevin M. Gallagher, Esquire, Edmond S. Kim, Esquire, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Michael R. Shumaker, Esquire (*argued*), Christopher N. Thatch, Esquire, Anika M. Smith, Esquire, JONES DAY, Washington, District of Columbia, *Attorneys for Defendants Argosy Investment Partners IV, L.P. and Anvil Capital Partners III, L.P.*

**WALLACE, J.**

Plaintiff-Buyers acquired certain companies from Defendant-Sellers through a purchase agreement. That purchase agreement provided for a post-closing earnout payment due to Sellers if certain criteria were met. If an earnout-payment dispute arose, the agreement provided that it would be resolved by an independent accountant. The independent accountant's report would then only be reviewable by a court for clear and manifest error.

One such earnout-payment dispute indeed arose. So, the parties sent it to an independent accountant for resolution. The independent accountant issued its report. In that written report, the independent accountant determined that Buyers indeed owe Sellers an earnout payment.

Displeased, Buyers filed suit. Buyers say that the written report isn't final and binding on the parties, that the independent accountant exceeded its contracted-for authority, and that the independent accountant manifestly erred. Sellers counter that the written report is final and binding and that Buyers breached the agreement by failing to make the earnout payment. Sellers now move for summary judgment on Buyers' affirmative counts and their own counterclaims.

As the acquisition agreement provides, the independent accountant's written report is final and binding on the parties. The independent accountant didn't exceed the scope of its authority under the agreement. And none of the written report's findings constitute manifest error.

As such, Sellers are entitled to a final declaration that the determined earnout payment is valid and enforceable. But Sellers haven't prevailed on their breach-of-contract claim. Nor have they earned their incurred fees and costs as they suggest.

Accordingly, and for the reasons further explained now: Sellers' Motion for Summary Judgment on Buyers' Affirmative Counts is **GRANTED**; Sellers' Motion for Summary Judgment on their First Counterclaim is **GRANTED**; Sellers' Motion for Summary Judgment on their Second Counterclaim is **DENIED**; and, Sellers' Request for Fees and Costs is **DENIED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. THE PARTIES

Plaintiff AM Buyer, LLC is a Delaware limited liability company.[1] AM Buyer is a subsidiary of Plaintiff AM Intermediate Parent, Inc. ("Buyer Parent" and collectively for ease of reference, "AM Buyer").[2]

Defendants Argosy Investment Partners IV, L.P. and Anvil Capital Partners III, L.P., (collectively for ease of reference, "Argosy") are Delaware limited partnerships.[3]

---

[1] Complaint ("Compl.") ¶ 2 (D.I. 1).

[2] *Id.* ¶ 3.

[3] *Id.* ¶¶ 4–5. Argosy and Anvil are identified as the "Sellers' Representative" in the operative agreement. *Id.*

**B. THE MEMBERSHIP INTEREST PURCHASE AGREEMENT**

In May 2020, AM Buyer acquired certain "Acquired Group[s]"[4] from Argosy via a Membership Interest Purchase Agreement ("MIPA").[5] The MIPA provides for a base purchase price along with a potential post-closing "Earnout Payment."[6]

The potential Earnout Payment is central to this dispute. Described in MIPA Section 2.1(b), the Earnout Payment amount, if any, is based on an "Earnout Period EBITDA" calculation with respect to the "Earnout Period."[7] Earnout Period EBITDA is also a defined term in the MIPA.[8] Relevant here, the definition includes:

> (v) any compensation and benefits costs with respect to an individual hired to fill the open Production Engineer position, the open Distribution Manager position or the two open OEM Sales Manager positions within the Acquired Group consistent with the expenses added back in the budget presented to the buyer (see Exhibit F attached hereto) and
>
> (vi) non-recurring transaction costs and expenses (including, without limitation, professional advisor fees, closing fees, diligence fees and similar expenses) incurred by or on behalf of the Acquired Group (including, without limitation, in connection with the completion of the Contemplated Transactions, financing relating to

---

[4] "Acquired Group" is defined in the MIPA as "(a) Holdings, (b) Enefco Holding, and (c) each Operating Company; provided, that for the avoidance of doubt any reference to Acquired Group herein shall include each Company that is a member of the Acquired Group." Transmittal Affidavit of Edmond S. Kim in Support of Defendants' Motion for Summary Judgment ("Kim Aff."), Ex. 1 ("MIPA") Art. X (Definitions) (underlining in original) (D.I. 11).

[5] *See generally* MIPA.

[6] *Id.* § 2.1.

[7] *Id.* § 2.1(b)(i). The "Earnout Period" is defined as between July 2020 and June 2021. *Id.* Art. X (Definitions).

[8] *Id.* Art. X (Definitions).

the Contemplated Transactions and the raising of equity capital in connection with and in furtherance of the Contemplated Transactions) . . . .[9]

MIPA Exhibit F is titled "Budget re: Earnout Period EBITDA."[10] It provides an "Adjusted Budget" that was presented to AM Buyer.[11]

Section 2.1(b) governs Earnout Payment procedures. Sub-section (i) says:

On or before September 1, 2021, Buyer Parent shall prepare and deliver to the Sellers' Representative an earnout statement (the "***Earnout Statement***"), which shall set forth Buyer Parent's good faith determination of (i) Earnout Period EBITDA, and (ii) the Earnout Payment, if any.[12]

If Argosy disagrees with the Earnout Statement, then pursuant to sub-section (ii):

Within thirty (30) days after Buyer Parent's delivery of the Earnout Statement to the Sellers' Representative, the Sellers' Representative may deliver written notice (the "***Earnout Protest Notice***") to Buyer Parent of any objections, and the basis therefor, which the Sellers' Representative may have to the Earnout Statement. Any Earnout Protest Notice shall specify in reasonable detail the nature of any disagreement so asserted, to the extent that the Sellers' Representative has been furnished with access to the information reasonably necessary for the Sellers' Representative to provide such detail.[13]

The sub-section then states:

If the Sellers' Representative delivers the Earnout Protest Notice within the prescribed thirty (30)-day time period and the Parties have not resolved all disagreements as to the computation of the Earnout Period

---

[9]   *Id.* (underlining in original).

[10]   *Id.*, Ex. F (Budget re: Earnout Period EBITDA).

[11]   *Id.*

[12]   *Id.* § 2.1(b)(i) (bold and italics in original).

[13]   *Id.* § 2.1(b)(ii) (bold and italics in original).

EBITDA and Earnout Payment within thirty (30) days after the delivery of such Earnout Protest Notice, then the dispute resolution procedures in <u>Section 2.2(b)(ii)</u> shall apply thereto, *mutatis mutandis*.[14]

MIPA Section 2.1(b)(iv) provides certain covenants relating to the Earnout Period. Relevant here, Buyer Parent covenants that "it shall at all times maintain, and cause the Acquired Group to maintain, separate books, records and financial statements for the Acquired Group reasonably sufficient to determine, and to provide the to the Sellers' Representative sufficient and accurate verification of, the Earnout Payment."[15]

MIPA Section 2.2(b) identifies and defines documents that need to be included in the "Closing Statement."[16]  Sub-section (i) then allows for a "Protest Notice" if there is a disagreement regarding the Closing Statement documents.[17]  Sub-section (ii), titled "Resolution of Protest," says:

> If the Buyer and the Sellers' Representative are unable to resolve any disagreement with respect to the calculation of [the Closing Statement documents], within thirty (30) days following the delivery of any Protest Notice, then either the Buyer or the Sellers' Representative may refer the items remaining in dispute to . . . an independent accounting firm of national reputation reasonably satisfactory to the Buyer and the Sellers' Representative (in either case, the "***Independent Accountant***").[18]

---

[14]  *Id.* § 2.1(b)(ii) (underlining and italics in original).

[15]  *Id.* § 2.1(b)(iv)(C).

[16]  *Id.* § 2.2(b).

[17]  *Id.* § 2.2(b)(i).

[18]  *Id.* § 2.2(b)(ii) (bold and italics in original).

After detailing each party's submission requirements to the Independent Accountant, the sub-section states that:

> The Independent Accountant shall conduct its review, resolve all disputes and, to the extent necessary, compute the [Closing Statement documents], as applicable to the extent such item remains in dispute, based solely on the information submitted by the Sellers' Representative and the Buyer (not by independent review or otherwise).[19]

The sub-section further states:

> In resolving any disputed item, the Independent Accountant (A) may not assign a value to any particular item greater than the greatest value for such item claimed by either the Sellers' Representative or the Buyer, or less than the lowest value for such item claimed by either the Sellers' Representative or the Buyer, in each case as presented to the Independent Accountant, (B) shall be bound by the principles set forth in this Section 2.2, and (C) under all circumstances, shall limit its review to matters specifically set forth in the Protest Notice.[20]

Sub-section (iii) is titled "Final Determination."[21]  It provides that:

> Notwithstanding anything to the contrary in this Agreement, any disputes raised in the Protest Notice regarding any amount shown in the Closing Statement shall be resolved solely and exclusively as set forth in this Section 2.2(b). The findings and determinations of the Independent Accountant as set forth in its written report shall be deemed final, conclusive and binding upon the Parties and shall not be subject to collateral attack for any reason, other than fraud or clear and manifest error. The Parties shall be entitled to have a judgment entered on such written report in any court of competent jurisdiction.[22]

---

[19]  *Id.* § 2.2(b)(ii).

[20]  *Id.* (underlining in original).

[21]  *Id.* § 2.2(b)(iii).

[22]  *Id.* (underlining in original).

Under MIPA Section 2.1(b)(iii), the Earnout Payment is due "[w]ithin five (5) Business Days after the final determination of the Earnout Period EBITDA Amount and Earnout Payment . . . ."[23]

MIPA Article IX governs indemnification.[24] Section 9.4 provides that:

Subject to the terms, conditions and limitations set forth in this Article IX, the Buyer and the Buyer Parent shall . . . jointly indemnify, defend and hold harmless the Sellers . . . from and against any and all Losses sustained or incurred by any Seller Indemnified Party based upon, arising out of or resulting from: . . . (b) any breach of any Covenant made by such Person in this Agreement.[25]

## C. THE EARNOUT PAYMENT DISPUTE

Pursuant to MIPA Section 2.1(b)(i), Buyer Parent delivered its Earnout Statement to Argosy containing its Earnout Period EBITDA calculation for the Earnout Period.[26] According to that calculation, no Earnout Payment was due.[27]

Argosy objected to Buyer Parent's Earnout Statement with an Earnout Protest Notice in accordance with MIPA Section 2.1(b)(ii).[28] The Earnout Protest Notice first outlined its dispute with the Earnout Statement.[29] In that initial section, the

---

[23] *Id.* § 2.1(b)(iii).

[24] *Id.* Art. IX (Indemnification).

[25] *Id.* § 9.4 (Indemnification by Buyer).

[26] Compl. ¶¶ 35–37.

[27] *Id.* ¶ 37.

[28] *Id.* ¶ 40; Kim Aff., Ex. 3 ("Earnout Protest Notice"). Argosy enlisted the help of Dicicco, Gulman & Company LLP ("DGC") to create its notice memorandum. Compl. ¶ 39; Earnout Protest Notice, Ex. A ("Earnout Protest Notice Memorandum").

[29] Earnout Protest Notice Memorandum Art. III (Earnout Payment).

notice described its view on Exhibit F:

> Attached as Exhibit F to the MIPA was the approved adjusted budget for 2020 reflecting Net Sales, Direct Costs, Overhead and Operating Expenses with a target EBITDA of $[a certain sum]. This detailed budget represents the mutual written agreement among the Parties on the intended operating model that management was supposed to follow post-closing for the Earnout Period. The Exhibit F budget was the foundation of the earnout structure as agreed to by the Parties (the "Approved Budget").[30]

The Earnout Protest Notice identified other "Observations and Findings" and noted certain "key material issues, discrepancies with the provisions of the MIPA and miscalculations of the Earnout Payment and the Earnout Period EBITDA."[31] Relevant here, the notice flagged AM Buyer's 2020 acquisition of a company called Teknipure.[32]  Specifically, the notice stated:

> DGC inquired about overhead costs and expenses of the Acquired Group allocable to Teknipure and was informed by the Buyer that it did not have the sophistication in its financial reporting to identify such costs and related allocations.  However, pursuant to the MIPA, the Buyer was required to identify costs associated with Teknipure as "it shall at all times maintain, and cause the Acquired Group to maintain, separate books, records and financial statements for the Acquired Group reasonably sufficient to determine, and provide to the Sellers Representative sufficient and accurate verification of, the Earnout Payment".[33]

According to DGC, an Earnout Payment was indeed owed after making seven add

---

[30]  *Id.*

[31]  *Id.* Art. IV (Observations and Findings).

[32]  *Id.*

[33]  *Id.*

back adjustments to the Earnout Period EBITDA calculation.[34]

## D. THE INDEPENDENT ACCOUNTANT'S ENGAGEMENT AND REPORT

Next, the parties attempted to resolve the Earnout Payment dispute pursuant to the MIPA's dispute resolution provisions.[35] Unable to do so within the prescribed period, the parties engaged Marcum LLP (the "Independent Accountant") in April 2022.[36] The parties elected Mr. Jimmy Pappas, Marcum's National Leader of Forensic Advisory Services, "to compute the amount of the Earnout payment, if any."[37]

According to the engagement letter, Mr. Pappas' role was to "arbitrate a post-acquisition earnout dispute . . . pursuant to the terms of" the MIPA.[38] Further, Mr. Pappas was engaged to "examine and opine upon the merits of the earn-out dispute in accordance with the terms and conditions set forth in [the MIPA] (including, without limitation, the principles set forth in Section 2.2(b)(ii) of [the MIPA])."[39]

Following the procedure set forth in that section, both parties sent opening

---

[34]   *Id.* Art. VI (Conclusion).

[35]   Compl. ¶¶ 42-44.

[36]   *Id.* ¶ 45.

[37]   *Id.* at ¶ 46; Kim Aff., Ex. 5 ("Engagement Letter"), at 1.

[38]   *Id.*

[39]   *Id.*

submissions and rebuttal statements to the Independent Accountant.[40]  Argosy's

opening statement identified the seven disputed items specified in the Earnout

Protest Notice, and Argosy's rebuttal statement identified five additional items in

dispute.[41]  The Independent Accountant then responded with questions and asked for

supplemental statements and documentation.[42]

In October 2022, the Independent Accountant issued its 26-page report (the

"Independent Accountant's Report").[43]  The Independent Accountant's Report

---

[40]  Compl. ¶¶ 49–52; Kim Aff., Ex. 7 ("Argosy Opening Statement") (D.I. 62); Kim Aff., Ex. 8 ("AM Buyer Opening Statement"); Kim Aff., Ex. 9 ("Argosy Rebuttal"); Kim Aff., Ex. 9 ("AM Buyer Rebuttal").

[41]  Argosy Opening Statement at 10-14 (Table 9); Argosy Rebuttal at 10-12 (Other Disputed Items).  In the end, the disputed items (totaling twelve) submitted were:

    1. Accounting support related to Aug-20 acquisition;

    2. Earnout period sales deferred to Jul-21;

    3. Strategy support related to Aug-20 acquisition;

    4. Senior management recruiting/relocation;

    5. Variable compensation in excess of budget;

    6. Professional fees related to Teknipure/Acquisition;

    7. Duplicate head of Europe;

    8. Marketing Consultant & BI Reporting Integration;

    9. Acquisition Expense;

    10. Web Consulting;

    11. Recruiting (Indeed); and,

    12. Miscellaneous Acquisition Expense.

Kim Aff., Ex. 13 ("Independent Accountant's Report"), at 6 (D.I. 63).

[42]  Compl. ¶ 53; Kim Aff., Ex. 10 ("Independent Accountant Inquiry").

[43]  *See generally* Independent Accountant's Report.

contains eight enumerated sections.[44]  Before resolving the twelve disputed items, the Independent Accountant identified four "recurring themes" permeating throughout the dispute: (1) MIPA Exhibit F; (2) the Bank Covenant EBITDA; (3) the transaction costs and expenses; and, (4) the separate books and records.[45] Relevant here are themes one and four.

In theme one, the Independent Accountant analyzed whether MIPA Exhibit F was an "Approved Budget" that Buyer should have followed, or merely a calculation method for the purposes of calculating Earnout Period EBITDA.[46]  Based on its "analysis of the MIPA," the Independent Accountant found that "the inclusion of Exhibit F therein is best interpreted as providing budgetary parameters for the operation of the Acquired Group by the Buyer during the Earnout Period."[47]  The Independent Accountant identified and described multiple MIPA considerations it relied upon in reaching that conclusion.[48]

In theme four, the Independent Accountant addressed Buyer's obligation under MIPA Section 2.1(b)(iv) to "maintain . . . separate books, records and financial statements for the Acquired Group reasonably sufficient to determine, and to provide

---

[44]  *Id.* at 2 (Table of Contents).

[45]  *Id.* at 6–14 (Analysis of Matters Impacting Multiple Disputed Items).

[46]  *Id.* at 6–10 (MIPA Exhibit F – "*Budget re: Earnout Period EBITDA*").

[47]  *Id.* at 7.

[48]  *Id.* at 7–10.

to the Sellers' Representative sufficient and accurate verification of, the Earnout Payment."[49] Noting that the Buyer Parent "does not dispute" that it didn't maintain separate books and records, the Independent Accountant found that "the failure to maintain such separate books and records is contrary to the terms of the MIPA."[50] As such, the Independent Accountant found that, "in the context of the earnout dispute, the Independent Accountant may afford certain of the Sellers' Representative positions more weight in circumstances where lack of clarity on the pertinent issues exists as a result of the failure to maintain separate books and records."[51]

Having identified and resolved those four thematic issues, the Independent Accountant then addressed all twelve disputed items in the Earnout Period EBITDA calculation.[52] For each, the Independent Accountant described the nature of the disputed item, Argosy's adjustment and argument, AM Buyer's adjustment and argument, its own determination, and its reasoning.[53] The Independent Accountant then summarized all twelve disputed items in a table format.[54]

---

[49] *Id.* at 13–14 (Separate Books and Records).

[50] *Id.* at 13.

[51] *Id.* at 13–14.

[52] *Id.* at 14–25 (Determination of Disputed Items).

[53] *Id.*

[54] *Id.* at 25–26 (Summary of Disputed Item Determinations).

Based on those determinations, the Independent Accountant concluded that Buyer Parent owed Argosy an Earnout Payment and specified the amount owed.[55] Soon thereafter, Am Buyer initiated the present lawsuit.

## E. PROCEDURAL BACKGROUND

This action came to the Superior Court by way of a 10 *Del. C.* § 1902 transfer.[56] AM Buyer's transferred complaint brings three causes of action: declaratory judgment that the Independent Accountant's decision is not binding (Count I);[57] in the alternative, declaratory judgment that the Independent Accountant's decision exceeded the scope of its authority (Count II);[58] and, also in the alternative, declaratory judgment that the Independent Accountant's decision constituted manifest error (Count III).[59]

Argosy answered with two counterclaims of its own.[60] Concurrent with its answer, Argosy moved for summary judgment and to stay discovery.[61] The Court denied the motion to stay and deferred the motion for summary judgment until the parties engaged in "some" discovery "focused on the generation of the Independent

---

[55]   *Id.* at 26 (Earnout Period EBITDA and Earnout Payment).

[56]   D.I. 2.

[57]   Compl. ¶¶ 91–99.

[58]   *Id.* ¶¶ 100–113.

[59]   *Id.* ¶¶ 114–124.

[60]   *See generally* Defendants' Answer and Counterclaims (D.I. 8).

[61]   D.I. 9; D.I. 12.

Accountant's Report."[62] Following that order, the parties engaged in written discovery[63] and deposed Mr. Pappas along with both parties' Rule 30(b)(6) corporate representatives.[64]

Now, Argosy moves for summary judgment on all of AM Buyer's affirmative counts and summary judgment in its favor on all its own counterclaims.[65] AM Buyer opposes the motion.[66] That motion is now ripe for decision.

## II. PARTIES' CONTENTIONS

Argosy moves for summary judgment dismissal of AM Buyer's three affirmative counts.[67] Regarding Count I, Argosy says that the MIPA's plain language makes the Independent Accountant's Earnout Payment determination final and binding.[68] With respect to Counts II and III, Argosy says that AM Buyer merely raises evidentiary issues already decided by the Independent Accountant that should be left undisturbed.[69]

---

[62] Order Denying Defendants' Motion to Stay Discovery and Deferring Defendants' Summary Judgment Motion at 2 (D.I. 32).

[63] D.I. 39; D.I. 40; D.I. 41.

[64] D.I. 57; D.I. 58; *see also* Kim Aff., Ex. 16 ("Pappas Dep. Tr.") (D.I. 65).

[65] *See generally* Opening Brief in Support of Defendants' Amended Motion for Summary Judgment ("Defs.' Mot. for Summ. J.") (D.I. 60).

[66] *See generally* Plaintiffs AM Buyer, LLC and AM Intermediate Buyer Parent, Inc.'s Opposition to Defendants' Amended Motion for Summary Judgment ("Pls.' Answering Br.") (D.I. 70).

[67] Defs.' Mot. for Summ. J. at 29–30.

[68] *Id.* at 16–20.

[69] *Id.* at 20–29.

Argosy also moves for summary judgment in its favor on its counterclaims.[70] In its first counterclaim, Argosy asks for the Court to declare that the Independent Accountant's rulings are final, conclusive, and binding, and to order AM Buyer to make the Earnout Payment as finally determined.[71] In its second counterclaim, Argosy says that AM Buyer's failure to make the Earnout Payment constitutes a breach of the MIPA.[72] Argosy asks the Court to award Argosy damages as a result of said breach.[73]

AM Buyer opposes Argosy's motion in full.[74] AM Buyer says that its Count I should survive because the MIPA's dispute resolution procedures make the Independent Accountant's Report non-binding on the parties.[75] For its Count II, AM Buyer contends that the Independent Accountant's Exhibit F interpretation and separate books and records conclusion exceeded the scope of its contracted-for authority.[76] And on Count III, AM Buyer identifies five errors in the Independent Accountant's Report it alleges were clear and manifest:

- That Exhibit F was the "approved budget" for the Earnout Period;

---

[70]  *Id.* at 30–33.

[71]  Defendants' Answer and Counterclaims ¶¶ 30–40.

[72]  *Id.* ¶¶ 41–48.

[73]  Defs.' Mot. for Summ. J. at 32–33.

[74]  *See generally* Pls.' Answering Br.

[75]  *Id.* at 23–28.

[76]  *Id.* at 9–19, 28–34.

- That AM Buyer didn't maintain separate books and records;

- Disputed Item No. 4's resolution regarding allocation of certain fees;

- Disputed Item Nos. 5 and 6's resolution regarding certain calculations and allocations; and,

- Disputed Item No. 3's resolution to add back certain compensation amounts.[77]

Last, AM Buyer argues that Argosy's request for damages, fees, and other costs is premature and inappropriate.[78]

## III. STANDARD OF REVIEW

Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits" show "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[79] The movant bears the initial burden of proving its motion is supported by undisputed facts.[80] If the movant meets its burden, the non-movant must show there is a "genuine issue for trial."[81] To determine whether a

---

[77] *Id.* at 9–22; Compl. ¶¶ 68–90.

[78] Pls.' Answering Br. at 34–36.

[79] Del. Super. Ct. Civ. R. 56(c); *Options Clearing Corp. v. U.S. Specialty Ins. Co.*, 2021 WL 5577251, at *7 (Del. Super. Ct. Nov. 30, 2021).

[80] *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979).

[81] Del. Super. Ct. Civ. R. 56(e); *see also Brzoska v. Olson*, 668 A.2d 1355, 1364 (Del. 1995) ("If the facts permit reasonable persons to draw but one inference, the question is ripe for summary judgment.").

genuine issue exists, the Court construes the facts in the light most favorable to the non-movant.[82]

The "Court may not be able to grant summary judgment 'if the factual record has not been developed thoroughly enough to allow the Court to apply the law to the factual record.'"[83] But "[i]f the Court finds that no genuine issues of material fact exists, and the moving party has demonstrated [its] entitlement to judgment as a matter of law, then summary judgment is appropriate."[84]

## IV. DISCUSSION

### A. THE INDEPENDENT ACCOUNTANT'S ROLE AS EXPERT, NOT ARBITRATOR.

Before addressing AM Buyer's affirmative counts, the Court must first determine if the Independent Accountant was engaged as an expert or an arbitrator. Argosy suggests that MIPA Section 2.2(b)(ii) calls for arbitration,[85] while AM Buyer says that provision calls for an expert determination.[86]

---

[82] *Judah v. Del. Tr. Co.*, 378 A.2d 624, 632 (Del. 1977).

[83] *Radulski v. Liberty Mut. Fire Ins. Co.*, 2020 WL 8676027, at *4 (Del. Super. Ct. Oct. 28, 2020) (cleaned up).

[84] *Brooke v. Elihu-Evans*, 1996 WL 659491, at *2 (Del. Aug. 23, 1996) (citing *Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc.*, 312 A.2d 322 (Del. Super. Ct. 1973)); *see also Jeffries v. Kent Cnty. Vocational Tech. Sch. Dist. Bd. of Educ.*, 743 A.2d 675, 677 (Del. Super. Ct. 1999) ("However, a matter should be disposed of by summary judgment whenever an issue of law is involved and a trial is unnecessary." (citing *Mitchell v. Wolcott*, 83 A.2d 759, 761 (Del. 1951))).

[85] *See* Defs.' Mot. for Summ. J. at 7–10 (referring to the Independent Accountant's "arbitration" of the dispute), 22 (citing to law about review of an arbitrator's decision); *see also* Reply Brief in Support of Defendants' Amended Motion for Summary Judgment ("Defs.' Rep. Br.") at 10–12 (D.I. 72).

[86] Pls.' Answering Br. at 2.

Following the Delaware Supreme Court's decision in *Terrell v. Kiromic Biopharma, Inc.*[87] and the Court of Chancery's decision *Penton Business Media Holdings, LLC v. Informa PLC*,[88] Delaware courts have applied the "authority test" to determine whether parties have opted for arbitration.[89] "The test turns primarily on the degree of authority delegated to the decision-maker."[90] In a plenary arbitration, the arbitrator has authority "to decide all legal and factual issues necessary to resolve the matter."[91] By contrast, an expert determination is typically limited "to deciding a specific factual dispute concerning a matter within the special expertise of the decision maker, usually concerning an issue of valuation."[92]

The Court of Chancery already resolved the expert or arbitrator question. In her minute order issued prior to transferring the case here, the Vice Chancellor ruled that "[t]he Accountant is an expert, not an arbitrator."[93] That ruling could now certainly be deemed the law of the case.[94]

---

[87] 297 A.3d 610 (Del. 2023).

[88] 252 A.3d 445 (Del. Ch. 2018).

[89] *See ArchKey Intermediate Holdings Inc. v. Mona*, 302 A.3d 975, 993 (Del. Ch. 2023); *Paul v. Rockpoint Grp., LLC*, 2024 WL 89643, at *10 (Del. Ch. Jan. 9, 2024); *Cedres v. Geoffrey Servs. Corp.*, 2024 WL 1435110, at *2 (Del. Ch. Apr. 3, 2024); *Pazos v. AdaptHealth LLC*, 2024 WL 3761817, at *6 (Del. Super. Ct. July 30, 2024).

[90] *ArchKey Intermediate Holdings Inc.*, 302 A.3d at 982.

[91] *Terrell*, 297 A.3d at 618 (cleaned up).

[92] *Id.*

[93] *AM Buyer, LLC & AM Intermediate Parent, Inc. v. Argosy Inv. Partners IV, L.P. & Anvil Capital Partners III, L.P.*, 2022-0991-MTZ (Chancery Dkt.) D.I. 54.

[94] "The law of the case doctrine is a 'judicially-created doctrine that prevents parties from

Even without that ruling, though, it's evident that MIPA Section 2.2(b) calls for an expert determination. Section 2.2(b)(ii) as applied to Section 2.1(b) is limited just to resolving Earnout Statement disputes—an isolated factual issue.[95] It calls for that specific factual dispute to be resolved by an Independent Accountant, a subject-matter expert.[96] The Independent Accountant was not tasked with making judicial determinations of legal obligations, and there are no judicial-proceeding-like guidelines or rules.[97] The Independent Accountant was also allowed to make inquisitorial investigations, and indeed did so by asking for supplemental submissions.[98] And the Court's review of the Independent Accountant's Report is limited to finding clear and manifest error.[99] With all that, it was no doubt the

---

relitigating issues that previously have been decided.'" *CRE Niagara Holdings., LLC v. Resorts Grp., Inc.*, 2023 WL 2625838, at *7 (Del. Super. Ct. Mar. 24, 2023) (cleaned up). "Once a matter has been addressed in a procedurally proper way by a court, it is generally held to be the law of that case and will not be disturbed by that court unless a compelling reason to do so appears." *Zirn v. VLI Corp.*, 1994 WL 548938, at *2 (Del. Ch. Sept. 23, 1994). Though decided by the Court of Chancery before transfer, this particular issue was resolved by a court within this same action in a procedurally proper way.

[95] *See Terrell*, 297 A.3d at 618.

[96] *See ArchKey*, 302 A.3d at 996 ("The first clue is that the decision maker is an Independent Accountant. That choice strongly suggests an intent to rely on the Independent Accountant's subject matter expertise . . . and [is] inconsistent with legal arbitration.").

[97] *See id.* ("A second clue is the absence of any reference to a set of procedural rules, which is a defining characteristic of arbitration provisions." (internal quotations and citations omitted)).

[98] *See id.* ("Experts are allowed to be more inquisitorial than judges and are not required to decide the dispute only on evidence submitted to them by the parties." (internal quotations and citations omitted)); *see also* Independent Accountant Inquiry.

[99] *See ArchKey*, 302 A.3d at 996–97 ("Review on the basis of manifest error is recognized under the law of contracts with respect to appraisals and expert determinations." (citations omitted)).

- 19 -

parties' intent to enlist the Independent Accountant as an expert, not arbitrator.

Accordingly, the Independent Accountant was acting as an expert, not arbitrator, in resolving the Earnout Payment dispute.[100]

## B. THE INDEPENDENT ACCOUNTANT'S REPORT IS FINAL AND BINDING.

Argosy first moves for summary judgment dismissal of AM Buyer's Count I. In that count, AM Buyer asks the Court to declare that the Independent Accountant's determination resolving the Earnout Statement dispute isn't final or binding.

Delaware law governs the MIPA, and in Delaware a contract's proper construction is a question of law.[101] "Delaware adheres to the 'objective' theory of contracts, *i.e.* a contract's construction should be that which would be understood by an objective, reasonable third party."[102] And "[w]hen the contract is clear and unambiguous, [the Court] will give effect to the plain-meaning of the contract's terms and provisions."[103] But a contract may be deemed ambiguous when it is

---

[100] For some additional support, compare *Cedres*, 2024 WL 1435110, at *2–4 (finding that the provision at issue called for arbitration because (1) the provision required the independent party to make judicial determinations of legal obligations in relation to the entire litigation, and (2) the provision provided judicial-proceeding-like guidelines) with MIPA § 2.2(b)(ii) (limiting the Independent Accountant's authority to a specific fact issue and eschewing judicial-proceeding-like guidelines).

[101] *E.g.*, *Exelon Generation Acquisitions, LLC v. Deere & Co.*, 176 A.3d 1262, 1266–67 (Del. 2017) ("The proper construction of any contract . . . is purely a question of law . . . .") (quoting *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992)); *Northrop Grumman Innovation Sys., Inc. v. Zurich Am. Ins. Co.*, 2021 WL 347015, at *9 (Del. Super. Ct. Feb. 2, 2021) ("[T]he interpretation of contractual language . . . is a question of law.")

[102] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (citation omitted).

[103] *Id.* at 1159–60 (Del. 2010) (citation omitted); *see also Rhone-Poulenc Basic Chems. Co.*, 616 A.2d at 1195 ("Clear and unambiguous language . . . should be given its ordinary and usual

subject to multiple reasonable interpretations.[104] When a contract is ambiguous, that "rais[es] factual issues requiring consideration of extrinsic evidence to determine the intended meaning of the provision[s] in light of the expectations of the contracting parties."[105]

The provisions to be interpreted here are MIPA sections 2.1(b) and 2.2(b). MIPA Section 2.1(b) governs the procedure for submitting and responding to an Earnout Statement.[106] Section 2.1(b)(ii) provides that, if "the Parties have not resolved all disagreements as to the computation of the Earnout Period EBITDA and Earnout Payment . . . then the dispute resolution procedures in Section 2.2(b)(ii) shall apply thereto, *mutatis mutandis*."[107] Section 2.1(b)(iii) then says that, "[w]ithin five (5) Business Days after the final determination of the Earnout Period EBITDA Amount and Earnout Payment," any determined Earnout Payment is owed.[108]

MIPA Section 2.2(b)(ii) describes those dispute resolution procedures—*vis à vis* an Independent Accountant—with reference to certain Closing Statement documents.[109] Section 2.2(b)(iii) then says that "[t]he findings and determinations

---

meaning.").

[104] *Osborn ex rel. Osborn*, 991 A.2d at 1160.

[105] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1229 (Del. 1997).

[106] MIPA § 2.1(b).

[107] *Id.* § 2.1(b)(ii) (italics in original).

[108] *Id.* § 2.1(b)(iii).

[109] *Id.* § 2.2(b)(ii).

of the Independent Accountant as set forth in its written report shall be deemed final, conclusive and binding upon the Parties . . . ."[110]

Those two MIPA provisions are brought together by the Latin phrase *mutatis mutandis*. That phrase is undefined in the MIPA, so the Court can look to its plain and commonly understood meaning.[111] *Mutatis mutandis* is commonly understood as "'useful Latinism'" that means "'the necessary changes having been made.'"[112] Since it would be time-consuming to note "'minor adjustments to individual provisions'" across different sections of the same instrument, it's conventional to accomplish such adjustments "'in one fell swoop with the Latin phrase *mutatis mutandis*.'"[113] In common English, the phrase's counterpart would be "'together with any necessary conforming changes.'"[114]

As employed here, *mutatis mutandis* makes necessary changes to MIPA Section 2.2(b)(ii) so that it can apply to Earnout Payment disputes. That makes sense, because MIPA Section 2.2(b)(ii) describes the dispute resolution procedure for Closing Statement document disputes, not Earnout Statement disputes.[115] After

---

[110] *Id.* § 2.2(b)(iii).

[111] *Osborn ex rel. Osborn*, 991 A.2d at 1159.

[112] *Penton Bus. Media Holdings, LLC*, 252 A.3d at 467 (quoting *In re IAC/InterActive Corp.*, 948 A.2d 471, 508 (Del. Ch. 2008)).

[113] *Id.* (citing Kenneth A. Adams, *A Manual of Style for Contract Drafting* 387 (4th ed. 2017)).

[114] *Id.*

[115] *See* MIPA § 2.2(b)(ii).

making the necessary minor changes, MIPA Section 2.2(b)(ii) unambiguously calls for an Independent Accountant to conduct its review, resolve all Earnout Statement disputes, and calculate the Earnout Payment as applicable and based solely on the information submitted by the parties.

The parties, in an apparent understanding of the *mutatis mutandis* language and its effect, indeed engaged an Independent Accountant to resolve their Earnout Statement dispute. But now that the Independent Accountant has issued its written report, AM Buyer says that report isn't final or binding.[116] Specifically, AM Buyer says Section 2.2(b)(iii) doesn't apply to Earnout Statement disputes because Section 2.1(b)(ii) only references Section 2.2's procedural provision, not its provision rendering the Independent Accountant's report final and binding.[117]

Not so. These parties agreed for an Independent Accountant to resolve Earnout Statement disputes. And they engaged Marcum LLP to do so through a written report. Once that report is issued, the MIPA describes its effect. In Section 2.2(b)(iii), it provides that the "findings and determinations of the Independent Accountant *as set forth in its written report* shall be deemed final, conclusive and binding upon the Parties[.]"[118] That provision applies to any written report by the

---

[116] Pls.' Answering Br. at 23–28.

[117] *Id.*

[118] MIPA § 2.2(b)(iii) (emphasis added).

Independent Accountant, regardless of dispute type.

Other MIPA provisions further solidify the written report's finality and effect. MIPA Section 2.1(b)(vi)—discussing Earnout Payment interest rates—explicitly says that "[a]ny portion of the Earnout Payment due and owing from Buyer Parent, *as finally determined pursuant to Section 2.2(b)(iii)*," bears interest at prescribed rates.[119] Contrary to AM Buyer's suggested interpretation, that provision clearly states that Earnout Statement disputes are "finally determined" by the Independent Accountant's written report.

"In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein."[120] When interpreting its provisions together, the MIPA unambiguously renders the written report final and binding on the parties. Accordingly, Argosy's motion for summary judgment on AM Buyer's Count I is **GRANTED**.

## C. THE INDEPENDENT ACCOUNTANT DIDN'T EXCEED ITS AUTHORITY UNDER THE MIPA.

Argosy moves for summary judgment on AM Buyer's Count II as well.[121] In that count, AM Buyer alleges that the Independent Accountant exceeded its scope

---

[119] *Id.* § 2.1(b)(vi) (emphasis added).

[120] *E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985).

[121] Defs.' Mot. for Summ. J. at 29–30.

of authority under the MIPA.[122] Because MIPA Section 2.2(b)(ii) is an expert determination provision, Delaware rules of contract interpretation and the MIPA's terms control the Court's review.[123]

Under MIPA Section 2.2(b)(ii), the Independent Accountant "shall conduct its review, *resolve all disputes* and, to the extent necessary, compute the [Earnout Period EBITDA], as applicable to the extent such item remains in dispute, *based solely on the information submitted by the Sellers' Representative and the Buyer (not by independent review or otherwise)*."[124] The section further provides that:

> In resolving any disputed item, the Independent Accountant (A) may not assign a value to any particular item greater than the greatest value for such item claimed by either the Sellers' Representative or the Buyer, or less than the lowest value for such item claimed by either the Sellers' Representative or the Buyer, in each case as presented to the Independent Accountant, (B) shall be bound by the principles set forth in this Section 2.2, and (C) under all circumstances, *shall limit its review to matters specifically set forth in the Protest Notice*.[125]

This section's provisions are unambiguous. The parties enlisted the Independent Accountant as an expert to resolve the Earnout Statement dispute and determine an Earnout Payment.

---

[122] Compl. ¶¶ 100–113.

[123] *See Penton Bus. Media Holdings*, 252 A.3d at 465-67; *see also Terrell*, 297 A.3d at 619 (applying contract interpretation principles after finding the dispute resolution provision did not call for arbitration); *Pazos*, 2024 WL 3761817, at *6–7 (same).

[124] MIPA § 2.2(b)(ii) (emphasis added).

[125] *Id.* (emphasis added).

AM Buyer points to two specific instances where it contends that the Independent Accountant exceeded its authority in the written report. First, AM Buyer says that the Independent Accountant made an unauthorized legal conclusion by determining that Exhibit F was an "approved budget" for the Earnout Period.[126] Second, AM Buyer says the Independent Accountant exceeded its authority when it determined that AM Buyer failed to maintain separate books and records.[127]

Put simply, the Independent Accountant didn't exceed its contracted-for authority when making determinations regarding certain factual disputes attendant to the earnout issue submitted to it; that's exactly what it was employed to do.

The parties submitted twelve disputed Earnout Statement items to the Independent Accountant for resolution. In addition, Argosy identified certain issues it found troubling in the Earnout Statement. The Independent Accountant then addressed those identified issues and resolved the twelve disputed items.

The Exhibit F budgetary issue was submitted to the Independent Accountant and addressed as one of the dispute's recurring themes. Using its expertise, the Independent Accountant interpreted Exhibit F and determined that it was an approved budget. That determination wasn't outside the MIPA-designated authority and isn't a legal conclusion. The Independent Accountant did not exceed the

---

[126] Pls.' Answering Br. at 10–15, 31.

[127] *Id.* at 16–19, 31–34.

MIPA's scope when interpreting and resolving the budgetary dispute stemming from Exhibit F.

The books and records issue was raised in the Earnout Protest Notice and presented to the Independent Accountant in turn. The Independent Accountant's Report addressed the issue in its "Analysis of Matters Impacting Multiple Disputed Items" section.[128] The Independent Accountant identified MIPA Section 2.1(b)(iv)'s requirement that AM Buyer "'at all times maintain, and cause the Acquired Group to maintain, separate books, records and financial statements for the Acquired Group reasonably sufficient to determine, and to provide to the Sellers' Representative sufficient and accurate verification of, the Earnout Payment.'"[129]

The Independent Accountant then exercised its contractually designated authority to determine, in the context of resolving the Earnout Statement dispute, that the Buyer did not maintain such separate books and records as is required by the MIPA.[130] After reaching that determination, the Independent Accountant's Report stated: "Consequently, in the context of the earnout dispute, the Independent Accountant may afford certain of the Sellers' Representative positions more weight in circumstances where lack of clarity on the pertinent issues exist as a result of the

---

[128] Independent Accountant's Report at 13–14.

[129] *Id.* at 13 (citing MIPA § 2.1(b)(iv)).

[130] *Id.*

failure to maintain separate books and records."[131]

The Independent Accountant's books and records determination was well within its contracted-for authority. The Independent Accountant resolved the books and records dispute submitted to it and then used its expertise as an accountant to provide a remedy. That remedy was for the specific purpose of resolving the Earnout Payment Dispute—not for any legal purpose.

As a designated expert, the Independent Accountant's authority was limited "to deciding a specific factual dispute within the decision maker's expertise."[132] An expert is not making decisions "on issues of law or legal claims."[133] This expert was tasked with resolving a specific factual dispute—the appropriate Earnout Payment owed—and was thus granted authority to resolve all relevant disputations therein. In so doing, the Independent Accountant weighed evidence from both sides and made certain determinations. Because that is what the parties agreed to, the MIPA's

---

[131] *Id.* at 13–14 (emphasis added).

[132] *Ray Beyond Corp. v. Trimaran Fund Mgmt., L.L.C.*, 2019 WL 366614, at *6 (Del. Ch. Jan. 29, 2019) (citing N.Y.C. BAR COMM. ON INT'L COM. ARB., PURCHASE PRICE ADJUSTMENT CLAUSES & EXPERT DETERMINATIONS: LEGAL ISSUES, PRACTICAL PROBLEMS & SUGGESTED IMPROVEMENTS at 4 (2013)); *see also Cedres*, 2024 WL 1435110, at *2–3 (Del. Ch. Apr. 3, 2024) ("The parties agree that the expert's determination of the disputed factual issue will be final and binding on them. The parties are not, however, normally granting the expert the authority to make binding decisions on issues of law or legal claims, such as legal liability." (quoting *Penton Bus. Media Holdings*, 252 A.3d at 464)).

[133] *Penton Bus. Media Holdings*, 252 A.3d at 464. That differs from arbitration, where "the parties have intended to delegate to the decision maker authority to decide all legal and factual issues necessary to resolve the matter." *Id.*

scope wasn't exceeded here.

Accordingly, Argosy's motion for summary judgment on AM Buyer's Count II is **GRANTED**.

### D. THE INDEPENDENT ACCOUNTANT DIDN'T COMMIT MANIFEST ERRORS.

Argosy also moves for summary judgment dismissal of AM Buyer's Count III.[134] In that count, AM Buyer says the Independent Accountant's Report contains multiple manifest errors.[135] The same previously discussed rules of contract interpretation apply.[136]

MIPA Section 2.2(b)(iii) states that "[t]he findings and determinations of the Independent Accountant as set forth in its written report shall be deemed final, conclusive and binding upon the Parties and shall not be subject to collateral attack for any reason, other than fraud or *clear and manifest error*."[137] Based on that provision's unambiguous terms, the Court can only overturn the Independent Accountant's final determination regarding the owed Earnout Payment if it finds clear and manifest error.

"[C]lear and manifest error" is not defined in the MIPA, but the core of the

---

[134] Defs.' Mot. for Summ. J. at 29–30.

[135] Compl. ¶¶ 114–124.

[136] *See* Part IV(B), *supra*.

[137] MIPA § 2.2(b)(iii) (emphasis added).

term at issue here was recently defined by this Court in *Pazos v. AdaptHealth LLC*.[138]

There, the Court described a manifest error as a "plain and obvious error," or an error

which is "obvious or easily demonstrable without extensive investigation."[139]

What's more, manifest error should be "confined to errors which are obviously

capable of affecting the determination."[140]  Such an error "need not be manifest at

the time the decision is made, but may become manifest as a result of subsequent

investigation."[141]

The Court will employ the manifest error formulation described in *Pazos*.

Thus, the Independent Accountant "only committed manifest error if it made a plain

and obvious error, and the record demonstrates strong reliance on that error."[142]

To make its manifest-error decision, the Court may consider "the reasons

---

[138] 2024 WL 3761817, at *7–8.  The phrasing at issue in *Pazos* was that the independent accountant's determination "shall not be subject to appeal or further review absent *manifest error*." *Id.* at *7 (emphasis added). The addition of "clear and" by these sophisticated parties here can only—if anything—serve to further restrict the type of error subject to judicial review and increase the complainer's burden. *See Weinberg v. Waystar, Inc.*, 249 A.3d 1039, 1045 (Del. 2023) (noting that in a contract "'and' typically bears a conjunctive meaning"); *see also Clear*, MERRIAM-WEBSTER DICTIONARY (online ed.), www.merriam-webster.com/dictionary/clear (last visited Aug. 29, 2024) (defining "clear" in pertinent part as "free from obscurity or ambiguity: easily understood; unmistakable); and *Clear error*, BLACK'S L. DICTIONARY 683 (11th ed. 2019) (describing "clear error" as a "decision or action that appears to a reviewing court to have been unquestionably erroneous).

[139] *Id.* at *7 (quoting KENDALL ON EXPERT DETERMINATION § 14.11-2, at 347 (5th ed. 2015) [hereinafter KENDALL ON EXPERT DETERMINATION]).

[140] *Id.* (quoting KENDALL ON EXPERT DETERMINATION, *supra*, § 14.11-4, at 348).

[141] *Id.* at *8 (quoting KENDALL ON EXPERT DETERMINATION, *supra*, § 14.11-2, at 347).

[142] *Id.*

expressed for the expert's determination (which might include some clarification of those reasons), 'documents which are expressly referred to in the determination and form an essential part of the determination (such as the agreement between the parties), the submissions of the parties which are referred to in the reasons,' and the easily discernable facts."[143]

In its complaint and briefing, AM Buyer points to five allegedly manifest errors made by the Independent Accountant.[144] For each purported error, AM Buyer tries to poke holes in the Independent Accountant's specific determinations. AM Buyer says that the Independent Accountant's Exhibit F determination constitutes error because the MIPA doesn't explicitly define it as a binding approved budget.[145] AM Buyer points to certain submissions to show that it did, in fact, maintain separate books and records.[146] AM Buyer further posits that the Independent Accountant made "the unsupported and incorrect determination to

---

[143] *Id.* at *9 (quoting KENDALL ON EXPERT DETERMINATION, *supra*, § 14.11-3, at 347–48).

[144] Compl. ¶¶ 68–90 (identifying errors); Pls.' Answering Br. at 9–22 (same). Recall, those five purported errors are:
- That Exhibit F was the "approved budget" for the Earnout Period;
- That AM Buyer didn't maintain separate books and records;
- Disputed Item No. 4's resolution regarding allocation of certain fees;
- Disputed Item Nos. 5 and 6's resolution regarding certain calculations and allocations; and,
- Disputed Item No. 3's resolution to add back certain compensation amounts.

[145] Pls.' Answering Br. at 10–16.

[146] *Id.* at 16–19.

allocate 25% of the Senior Manager Recruiting/Relocation fees to Earnout Period EBITDA" when resolving disputed item number 4.[147] And AM Buyer contends that, with regards to disputed items 5 and 6, the Independent Accountant "reperformed calculations and used an allocation methodology in favor of Sellers' Representatives, while ignoring or failing to solicit [AM Buyer's] position."[148] Too, AM Buyer argues that the Independent Accountant conducted an "independent review" by adding back the Interim Chief Marketing Officer's compensation without properly documented support.[149]

In its briefing, AM Buyer asks the Court to do a deep dive into each allegedly errant fact determination, scrutinize Mr. Pappas' deposition answers, and conduct its own accountant-level review. The Court declines that invitation. The Court's role is limited to determining whether a plain and obvious error occurred.[150]

When conducting that limited review, AM Buyer's identified determinations don't constitute either clear or manifest error. Regarding Exhibit F, the Independent Accountant reviewed both sides' arguments and determined that it's inclusion in the

---

[147] Compl. ¶¶ 75–81.

[148] *Id.* ¶¶ 82–86.

[149] *Id.* ¶¶ 87–90.

[150] *See CLP Toxicology, Inc. v. Casla Bio Holdings LLC*, 2019 WL 1233458, at *1 (Del. Ch. Feb. 18, 2019) (which might take the form of "an unambiguous and undisputed mistake of fact"); *see also Tenenbaum Living Tr. v. GCDI S.A.*, 682 F. Supp. 3d 342, 355 (S.D.N.Y. 2023) (noting that proper employment of a manifest error clause "requir[es] courts not to make such determinations themselves but rather to defer to qualified experts selected by the parties.").

MIPA is best interpreted as providing operative budgetary parameters.[151]  With respect to separate books and records, the Independent Accountant reviewed the evidence submitted by both parties and sided with Argosy.[152]  In resolving disputed items 4, 5, and 6, the Independent Accountant factored in AM Buyer's failure to maintain separate books and records, considered a number of invoices for support, weighed both sides' positions, and made a determination for each.[153]  And when settling disputed item number 3, the Independent Accountant was presented with documents and other evidence sufficient to reach a conclusion.[154]  None of those determinations constitute either clear or manifest error by the Independent Accountant.

The Independent Accountant's designated task was to "examine and opine upon the merits of the earn-out dispute in accordance with the terms and conditions set forth in [the MIPA] (including, without limitation, the principles set forth in Section 2.2(b)(ii) of [the MIPA])."[155]  The Independent Accountant did just that in its twenty-six-page report, identifying and addressing four thematic issues before

---

[151] *See* Independent Accountant's Report at 6–10.

[152] *See id.* at 13–14.

[153] *See id.* at 18–22.

[154] *See id.* at 17–18.

[155] Engagement Letter at 1.

resolving all twelve disputed items in the Earnout Period EBITDA calculation.[156]

For each determination, the Independent Accountant's Report described the nature of the disputed item, weighed arguments and documents against each other, and resolved the dispute.[157] Those determinations are supported by the parties' submissions and well-reasoned in the report. They aren't, as is required here, either clear or "plain and obvious error."[158]

At bottom, the ability to weigh documents one way or the other is within the province of this expert.[159] And "in order to decide the point which has been referred to him," an expert may sometimes "decide a disputed point of interpretation of the contract between the parties."[160] As such, the Independent Accountant had the authority to determine, based on the parties' submissions and its own MIPA interpretations, the parties' disputed items. AM Buyer's disquiet about just how the Independent Accountant weighed those items doesn't empower the Court to simply substitute its own judgment or analysis for this subject-matter expert's.[161] Because

---

[156] *See* Independent Accountant's Report at 6–14.

[157] *See id.*

[158] *See Pazos*, 2024 WL 3761817, at *7 (citing KENDALL ON EXPERT DETERMINATION, *supra*, § 14.11-2, at 347).

[159] *See* MIPA § 2.2(b)(ii).

[160] *ArchKey*, 302 A.3d at 997–98.

[161] *See Tenenbaum Living Tr.*, 682 F. Supp. 3d at 355 ("A manifest error clause avoids [the peril of a court's erroneous financial computations] by requiring courts not to make such determinations themselves but rather to defer to qualified experts selected by the parties."); *id.* ("for manifest error clauses to properly serve their function, they must preclude courts from reexamining the

AM Buyer fails to identify any clear or manifest errors, its claim must be dismissed.

Accordingly, Argosy's motion for summary judgment on AM Buyer's Count III is **GRANTED**.

### E. ARGOSY IS ENTITLED TO ITS REQUESTED FINAL DETERMINATION, BUT NO BREACH OCCURRED AND NO FEES ARE OWED.

Last, Argosy moves for summary judgment in its favor with respect to both its counterclaims.[162] In its first counterclaim, Argosy asks for the Court to declare that the Independent Accountant's Report is valid and enforceable, and to order Argosy to make the Earnout Payment awarded in that report plus interest and fees.[163] In its second counterclaim, Argosy asks the Court to determine that AM Buyer breached the MIPA by failing to pay the Earnout Payment, and to award damages.[164] Argosy also asks for fees and costs associated with bringing the present motion.[165]

Argosy is entitled to its first counterclaim ask. Under MIPA § 2.2(b)(iii), the parties are "entitled to have a judgment entered on [the Independent Accountant]'s Report" in any court of competent jurisdiction."[166] As just discussed, the Independent Accountant's Report is final and binding on the parties and the

---

substantive correctness of the determination to which the clause applies").

[162] Defs.' Mot. for Summ. J. at 32–33.

[163] Defendants' Answer and Counterclaims ¶¶ 30–40.

[164] *Id.* ¶¶ 41–48.

[165] Defs.' Mot. for Summ. J. at 32–33.

[166] MIPA § 2.2(b)(iii).

Independent Accountant didn't commit either clear or manifest error. So, the Independent Accountant's Report is valid and enforceable, and AM Buyer must now make the finally determined Earnout Payment as the MIPA instructs.[167]

But Argosy falls short on its second counterclaim. A breach-of-contract claim requires: (1) the existence of a contract; (2) a breach of the contract; and (3) damages suffered as a result of the breach.[168] Under MIPA § 2.2(b)(iii), the Independent Accountant's findings and determinations "shall not be subject to collateral attack for any reason, *other than* fraud or *clear and manifest error*."[169]

Here, AM Buyer subjected the Independent Accountant's Report to a collateral attack within the MIPA's bounds by claiming that the written report contained manifest errors. AM Buyer hasn't breached the MIPA's provision that allows for such attacks. Indeed, the MIPA contemplates—for Earnout Payment disputes such as this one—that these parties "shall be entitled to have a judgment entered" by a "court of competent jurisdiction" after a manifest error attack.[170] Following this order's entry of judgment, the Earnout Payment will become due. But AM Buyer's failure to pay the Earnout Payment while the Independent Accountant's Report was actively challenged in this Court for clear and manifest

---

[167] *See id.* § 2.1(b)(iii).

[168] *E.g.*, *VLIW Tech., LLC v. Hewlett–Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

[169] MIPA § 2.2(b)(iii) (emphasis added).

[170] *Id.*

error doesn't constitute a breach of the MIPA's plain terms.[171]

Finally, Argosy isn't entitled to the fees and costs it asks for. Argosy points to the MIPA's indemnification provisions to justify its request.[172] But MIPA Section 9.4's plain language conditions indemnification upon AM Buyer's failure to perform a "covenant."[173] No such failure occurred. The MIPA doesn't otherwise impose an independent duty to pay defense costs.[174] Nor does it contain a fee-shifting provision.[175] And absent an express contractual provision, Argosy hasn't earned an award of fees and costs under Delaware law.[176]

Accordingly, Argosy's motion for summary judgment on its first counterclaim is **GRANTED.** But both Argosy's motion for summary judgment on its second counterclaim and its request for fees and costs are **DENIED**.

---

[171] In addition, the materiality of any alleged breach is a non-briefed factual issue. And even it were, materiality is a factual question not ordinarily well-suited for judgment as a matter of law. *See, e.g.*, *IP Network Sols., Inc. v. Nutanix, Inc.*, 2022 WL 369951, at *11 (Del. Super. Ct. Feb. 8, 2022).

[172] Defs.' Mot. for Summ. J. at 32–33 (citing MIPA § 9.4).

[173] *See* MIPA § 9.4(a).

[174] *See Winshall v. Viacom Int'l., Inc.*, 76 A.3d 808, 819 (Del. 2013).

[175] *See SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 352 (Del. 2013) ("In contract litigation, where the contract contains a fee-shifting provision, we will enforce that provision.").

[176] *See id.* ("Under the American Rule and Delaware law, litigants are normally responsible for paying their own litigation costs." (quoting *Mahani v. Edix Media Grp., Inc.*, 935 A.2d 242, 245 (Del. 2007))); *Kuang v. Nat'l. Cole Corp.*, 884 A.2d 500, 506 (Del. 2005) ("One well-recognized exception to the American Rule is where the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." (cleaned up and citations omitted)); *Lawson v. State*, 91 A.3d 544, 552 (Del. 2014) (the party seeking to invoke the bad-faith exception must demonstrate by "clear evidence that the party from whom fees are sought . . . acted in subjective bad faith" (internal quotations and citations omitted)). Argosy makes no such showing.

# V. CONCLUSION

For the foregoing reasons: Argosy's Motion for Summary Judgment on AM Buyer's Affirmative Counts is **GRANTED**; Argosy's Motion for Summary Judgment on its First Counterclaim is **GRANTED**; Argosy's Motion for Summary Judgment on its Second Counterclaim is **DENIED**; and, Argosy's Request for Fees and Costs is **DENIED**.

**IT IS SO ORDERED.**

/s/ *Paul R. Wallace*

_____

Paul R. Wallace, Judge