**The Estate of Lucille OSBORN, by and through its Co–Executor/Executrix Lawrence Osborn and Sharon Gillespie, Plaintiff Below, Appellant,**

v.

**Michael J. KEMP, Defendant Below, Appellee.**

No. 545, 2009.

Supreme Court of Delaware.

Submitted: March 3, 2010.
Decided: March 25, 2010.

Dean A. Campbell, Law Office of Dean A. Campbell, LLC, Georgetown, Delaware for appellant.

Bradley S. Eaby (argued) and Robert D. Cecil, Jr., The Eaby Firm, LLC, Dover, Delaware for appellee.

Before STEELE, Chief Justice, BERGER and RIDGELY, Justices.

STEELE, Chief Justice.

Michael Kemp signed a holographic real property sales contract with Lucille Osborn, and made monthly payments while living in her beach house for over 20 years. Osborn's estate asserts that Kemp signed a document for a leasehold interest, and appeals the Vice Chancellor's order to sell the house to him. Because the contract unambiguously expresses a purchase agreement; Kemp was ready, willing, and able to perform; and the balance of the equities tips toward specific performance, we **AFFIRM.**

## I. FACTS AND PROCEDURE POSTURE

Osborn lived in Wilmington and had a beach house in Slaughter Beach, Sussex County. Lucille and her husband bought the beach house back in 1968. The beach house had two floors which were divided into two separate apartments. In 1984, Osborn decided to rent out the top floor, but wanted to keep the bottom floor for herself, so she could enjoy the beach from time to time. Osborn found a lessee in Kemp and on November 9, 1984, Kemp began leasing the upper apartment at a rate of $275 a month, plus utilities. Later that year, Kemp's friend, Roxanne Danburg also moved in and both took to living in the upper apartment and have lived there ever since.

From the start Kemp wanted to buy the beach house and on April 16, 1985, Osborn and Kemp entered into an agreement which is the subject of this litigation. That day Osborn allegedly agreed to sell the beach house to Kemp. Kemp drafted the holographic document which provided, in its entirety,

> I, Michael Kemp agree to pay Lucille Menicucci $275.00 per month plus utilities for twenty years for the purchase of property at 292 S. Delaware and Bay Ave. Slaughter Beach for $50,000.

Kemp signed his name on the bottom right of the document and Osborn signed under Kemp's name.[1] Osborn and Kemp decided to get the document notarized that very same day and, eventually, arrived at Cedar Creek Bait and Tackle Shop.

At the bait shop, Joyce M. Macklin, a public notary, notarized the agreement and placed an embossed seal on the document. Macklin signed at the bottom, to the left of the signatures of both Osborn and Kemp. Macklin testified at trial that she remembered signing this document because she did not see many handwritten documents for the sale of real property. Macklin, however, could not recollect who brought her the document or how many people saw her notarize the document. Macklin testified that before she notarized a document, she customarily requested photo identification from the signatories.

After Macklin notarized the document, Osborn left with the original. She later photocopied the document and sent it to Kemp for his records. Soon after, Osborn remarried and signed an antenuptial agreement with her husband. The antenuptial agreement stated that Osborn owned the property in fee simple without mentioning the contract with Kemp.

By the document's express terms, Kemp would pay $275 per month for twenty years. For those next twenty years, Kemp and Danburg lived together in the beach house. Kemp made $11,000 worth of improvements to the house.[2] Kemp and Danburg made their scheduled payments lackadaisically, paying several months at once and frequently late, but, in the end, no dispute with Osborn arose over any missed payments. Kemp or Danburg would send payment to Osborn and she would send them a copy of the receipt.

---

1. Sharon Gillespie, who brought this suit on behalf of the Estate of Lucille Osborn, also contended in the Court of Chancery that Osborn's signature was a forgery and presented an expert witness to dispute the authenticity of the signature. The expert witness could not determine whether the signature was a forgery. Gillespie has not raised this as an issue on appeal.

2. Gillespie contends that Osborn reimbursed Kemp for these improvements and produced receipts which Gillespie claims showed that Osborn repaid Kemp for his expenditures. But these receipts to do not explicitly state that they were receipts reimbursing Kemp for improvements.

These receipts refer to the payments only as "rent." Also, Osborn listed on a 2004 tax return that the payments made by Kemp and Danburg were "rent" and did not indicate Kemp's ownership stake.

Because Osborn and Kemp consummated the deal in April of 1985, the installment payments were set to end in April of 2005. April, 2005 came and passed with little moment and more payments. In July, 2005, Kemp and Danburg sent Osborn a check for past "rent" for the months of May, June, and July. Kemp claims that he realized his error in August 2005 and stopped making payments. Kemp did not inquire about the overpayments because he assumed that Osborn would put them towards his utility bills. Kemp still did not have the deed and testified that sometime in August he spoke with Osborn about the deed transfer, but they did not set a firm date for the transfer.

As of May 2006, Osborn still owned the property of record when tragedy struck. Osborn's neighbors in Wilmington found her unconscious on the floor of her home. Osborn never recovered and began to suffer from dementia. Fortunately for Osborn, her adoring niece, Sharon Gillespie, took care of her needs and soon assumed all of Osborn's affairs under a previously executed power of attorney. While going over Osborn's records, Gillespie noticed that Kemp had stopped making payments on the beach house. Osborn never told Gillespie, nor did Gillespie have any reason to know, about the holographic contract. Gillespie assumed that Kemp merely leased the beach house.

In August 2006, Gillespie traveled to Slaughter Beach to inquire about the missed rent payments. According to Gillespie, Kemp apologized profusely and agreed to pay the back rent. Gillespie claims, and Kemp does not dispute, that Kemp did not mention anything about the contract, nor did Kemp assert any legal ownership interest in the beach house. Gillespie left that day with the understanding that Kemp would resume paying rent.

From that point on Kemp and Gillespie's relationship deteriorated. Kemp did not provide any funds and in January 2007, Gillespie hired a lawyer and served Kemp with a "5–Day Notice" to obtain past due rent and utilities payments. Kemp responded by sending Gillespie a copy of the copy of the installment contract and asserted that he had a property interest in the beach house. Gillespie was taken aback because this was the first time she knew about any claim of right on the property.

On August 17, 2007, Gillespie filed suit on behalf of Osborn seeking a permanent injunction, declaratory judgment, and restitution against Kemp. Kemp answered and on August 8, 2008, Kemp amended his complaint to include a counterclaim for specific performance. The parties went to trial in the Court of Chancery on October 29, 2008. Osborn could not testify at trial because her mental faculties declined. She died on December 15, 2008. At the conclusion of the trial, the Vice Chancellor ordered specific performance and dismissed Osborn's complaint with prejudice.

The Vice Chancellor issued a memorandum opinion in which, first, he found that the photocopy of the holographic installment contract is authentic [3] and then held (1) the parties entered into a valid contract, (2) Kemp was ready, willing, and able to perform, and (3) the balance of the

---

**3.** The Vice Chancellor devoted a significant portion of his opinion establishing the documents' authenticity, however, Gillespie does not challenge the Vice Chancellor's ruling on that issue on appeal.

equities tipped in favor of specifically enforcing the contract. The Vice Chancellor also rejected Osborn's argument that the doctrine of laches barred Kemp's claim.

The Vice Chancellor set the terms of specific performance as (1) Kemp must pay the Estate of Osborn $50,000 within 90 days, (2) Kemp must pay interest, compounded quarterly, accruing from April 16, 2005,[4] (2) Kemp must remit to the Estate payment for utilities up until the present time, (3) Kemp must pay for the deed preparation and closing costs, (4) and the Estate would pay the transfer tax pursuant to 30 *Del. C.* § 5412. Gillespie, as co-executrix of Osborn's estate, appeals the Vice Chancellor's decision.

## II. ANALYSIS

 We review questions of law and interpret contracts *de novo.*[5] We review a trial judge's factual findings for clear error.[6] We review the grant of specific performance for abuse of discretion.[7]

### 1. *Specific Performance*

 Specific performance for the transfer of real property is an extraordi-

nary remedy and we will not award it lightly.[8] A party must prove by clear and convincing evidence that he or she is entitled to specific performance[9] and that he or she has no adequate legal remedy.[10] A party seeking specific performance must establish that (1) a valid contract exists, (2) he is ready, willing, and able to perform, and (3) that the balance of equities tips in favor of the party seeking performance.[11] We will examine each element separately.

### (a) Validity of the Contract

 First, a valid contract exists when (1) the parties intended that the contract would bind them, (2) the terms of the contract are sufficiently definite, and (3) the parties exchange legal consideration.[12] Gillespie does not seriously dispute that the parties intended to be bound nor does she dispute that consideration passed hands. We will only briefly examine these elements.

The face of this contract manifests the parties' intent to bind one another contractually. Both parties signed the contract

---

4. The Vice Chancellor offset these payments by requiring the parties to take into account Kemp's payments made after April 2005.

5. *Kuhn Construction, Inc. v. Diamond State Port Corp.,* 2010 WL 779992, *2 (Del. Mar. 8, 2010).

6. *Olson v. Halvorsen,* 986 A.2d 1150, 1157 (Del.2009).

7. *U.S. Dimension Products, Inc. v. Tassette, Inc.,* 290 A.2d 634, 635 (Del.1972).

8. *Szambelak v. Tsipouras,* 2007 WL 4179315, at *1 (Del.Ch. Nov. 19, 2007) ( "[S]pecific performance is an extraordinary remedy....") (Letter Opinion); *see also Morabito v. Harris,* 2002 WL 550117, at *1 (Del.Ch. Mar. 26, 2002) ("Specific performance is a remedy predicated upon the exercise of equitable discretion....") (Letter Opinion).

9. *United Rentals, Inc. v. RAM Holdings, Inc.,* 937 A.2d 810, 834 n. 112 (Del.Ch.2007); *see also Deene v. Peterman,* 2007 WL 2162570, at *5 (Del.Ch. July 12, 2007); ("In other words, the court must be certain of the essential elements of the contractual obligation it is asked to enforce.").

10. *West Willow–Bay Court, LLC v. Robino–Bay Court Plaza, LLC,* 2007 WL 3317551, at *12 (Del.Ch. Nov. 2, 2007) ("The party seeking specific performance must show that there is no adequate remedy at law.").

11. *Morabito,* 2002 WL 550117, at *2.

12. *Carlson v. Hallinan,* 925 A.2d 506, 524 (Del.Ch.2006) ("Three elements are necessary to prove the existence of an enforceable contract: 1) the intent of the parties to be bound by it, 2) sufficiently definite terms and 3) consideration.").

and had the contract notarized. The parties also exchanged consideration for the beach house. The Vice Chancellor could not have more correctly held that we limit our inquiry into consideration to its existence and "not whether it is fair or adequate. Mere inadequacy of consideration, in the absence of any unfairness or overreaching, does not justify a denial of . . . specific performance where in other respects the contract conforms with the rules and principles of equity." [13] Here, Kemp paid Osborn an uninterrupted stream of income for twenty years, plus, an additional $50,000 due at settlement. These payments indisputably constitute consideration.

Gillespie does argue that the contract fails for indefiniteness and, thus, the Vice Chancellor erred by granting specific performance. Gillespie contends that we may reasonably interpret the price term in ways,[14] which create an indefinite ambiguity, and obviates specific performance. Gillespie points to the "$50,000" term and asserts that when the contract is read *in toto* the term could mean that Kemp has the option of paying $50,000 after making all monthly payments to fully consummate the transaction, or that Kemp would make installment payments of $275 per month for twenty years, on a $50,000 base price with the overage consisting of an amalgamation of interest, fees, and carrying costs for which the parties did not expressly provide.

The Vice Chancellor held that Kemp must pay $50,000 in order to obtain the property because (1) courts must read the contract in its entirety and give effect to all of its terms and provisions, and (2) the contract was ambiguous and applied the doctrine of *contra proferentem* to interpret the terms against the drafting party. The Vice Chancellor did not err when he held that he must read the contract in its entirety and give effect to all of its terms and provisions, however, the Vice Chancellor incorrectly found that the contract is ambiguous.

■■■ "Delaware adheres to the 'objective' theory of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable third party." [15] "We will read a contract as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage." [16] We will not read a contract to render a provision or term "meaningless or illusory." [17] "[A] contract must contain all material terms in order to be enforceable, and specific performance will only be granted when an agreement is clear and definite and a court does not need to supply essential contract terms." [18]

■■■ When the contract is clear and unambiguous, we will give effect to the

---

13. *Osborn v. Kemp*, 2009 WL 2586783, at *8 (Del.Ch. Aug. 20, 2009) (citing *Glenn v. Tide Water Assoc. Oil Co.*, 101 A.2d 339, 344 (Del. Ch.1953)).

14. *Walton v. Beale*, 2006 WL 265489, at *5 (Del.Ch. Jan. 30, 2006) (holding that essential terms are "price, date of settlement, and the property to be sold").

15. *NBC Universal v. Paxson Commc'ns*, 2005 WL 1038997, at *5 (Del.Ch. Apr. 29, 2005).

16. *Kuhn Construction, Inc. v. Diamond State Port Corp.*, 2010 WL 779992, *2 (Del. Mar. 8, 2010).

17. *Sonitrol Holding Co. v. Marceau Investissements*, 607 A.2d 1177, 1183 (Del.1992) ("Under general principles of contract law, a contract should be interpreted in such a way as to not render any of its provisions illusory or meaningless.").

18. *Ramone v. Lang*, 2006 WL 905347, at *10 (Del.Ch. Apr. 3, 2006).

plain-meaning of the contract's terms and provisions.[19] On the contrary, when we may reasonably ascribe multiple and different interpretations to a contract, we will find that the contract is ambiguous.[20] An unreasonable interpretation produces an absurd result or one that no reasonable person would have accepted when entering the contract.[21]

■■■■　If a contract is ambiguous, we will apply the doctrine of *contra proferentem* against the drafting party and interpret the contract in favor of the non-drafting party.[22] The parties' steadfast disagreement over interpretation will not, alone, render the contract ambiguous.[23] The determination of ambiguity lies within the sole province of the court.

This contract's only reasonable interpretation creates an installment contract with an option to purchase at the end of the term. The parties do not dispute the import of the $275 per month for twenty years. Under these terms, Kemp agreed to pay Osborn $275 a month for twenty years.

As for the language "purchase of property ... for $50,000", we let the plain-meaning of this term guide us. The contract includes a price term of $50,000 which clearly indicates that Kemp must remit $50,000 in additional proceeds to "purchase" the property. This prototypical condition commonly precedes the offeror's performance. Therefore, the ordinary, plain meaning of this term establishes installment payments with an option to purchase at the end of the term and obtain title.

Alternatively, if we read the $50,000 as the base price and the $16,000 as some arbitrary, unexplained interest or carry, calculated pursuant to a formula not found within the four corners of the contract, we would render the' explicit $50,000 purchase term meaningless or mere surplusage. The parties ask us to interpret the contract, contrary to both the plain meaning of the document and logic, and to reach an absurd, unfounded result. It stretches the bounds of reason to conclude that Osborn, a college graduate and professional tax preparer, would sell her property for a mere pittance based on an undefined, un-

**19.** *Rhone–Poulenc Basic Chem. Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del.1992) ("Clear and unambiguous language ... should be given its ordinary and usual meaning.").

**20.** *Twin City Fire Ins. Co. v. Delaware Racing Ass'n*, 840 A.2d 624, 628 (Del.2003); *see also Rhone–Poulenc Basic Chem. Co.*, 616 A.2d at 1195 ("[A] contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings.").

**21.** *Gore v. Beren*, 254 Kan. 418, 867 P.2d 330, 337 (1994) ("In placing a construction on a written instrument, reasonable rather than unreasonable interpretations are favored by law. Results which vitiate the purpose or reduce terms of the contract to an absurdity should be avoided."); *Born v. Hammond*, 218

Md. 184, 146 A.2d 44, 47 (1958) ("[I]f a contract was susceptible of two constructions, one of which would produce an absurd result and the other of which would carry out the purpose of the agreement, the latter construction should be adopted."); *Huntington on the Green Condo. v. Lemon Tree I–Condo*, 874 So.2d 1, 5 (Fla.Dist.Ct.App.2004) ("[I]f one interpretation would lead to an absurd conclusion, then such interpretation should be abandoned and the one adopted which would accord with reason and probability.") (citation omitted).

**22.** *In re Appraisal of Metromedia Intern. Group, Inc.*, 2009 WL 1509182, at *2 n. 10 (Del.Ch. May 28, 2009) (Letter Opinion).

**23.** *Rhone–Poulenc Basic Chem. Co.*, 616 A.2d at 1195 ("A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction.").

specified, implicit term. We cannot countenance such an absurd interpretation of the contract.

We hold that the unambiguous contract states a definite price term.

### (b) Ready, Willing, and Able to Perform

■ We will order specific performance only if a party is ready, willing, and able to perform under the terms of the agreement.[24] Unless the contract provides that time is of the essence,[25] we will permit the parties a reasonable time to obtain financing and conclude the transaction.[26]

Gillespie argues that Kemp is not ready, willing, and able to perform because he did not have the necessary financing at the time of trial. The Vice Chancellor found that Kemp could put the property up as collateral to obtain the funding and he held that Kemp had 90 days to exercise the option. We find no fault in the Vice Chancellor's reasoning. Kemp may put the property up as collateral and obtain financing. We hold that 90 days is a reasonable time period when a contract does not in-clude a "time is of the essence" clause to exercise an option to buy real property.

### (c) Balance of Equities Tips in Favor of Kemp

■ Lastly, we will only order specific performance where the balance of equities tips in favor of specific performance.[27] When balancing the equities "[we] must be convinced that 'specific enforcement of a validly formed contract would [not] cause even greater harm than it would prevent.'"[28]

Gillespie argues that, when looking at the "big picture," the balance of the equities tips against Kemp and specific performance. First, Gillespie introduced evidence that a one-story home in Slaughter Beach cost $106,000 in 1986 and that Kemp will only pay $116,000 for a far superior house, twenty years later.[29] Second, Osborn did not increase the rent over the course of twenty years and Kemp received ample benefit from this cheap rental rate. Third, Kemp and Danburg started out living only on the second floor, but eventually occupied the entire house and, even when they occupied both floors, they

---

24. *Morabito v. Harris*, 2002 WL 550117, at *2 (Del.Ch. Mar.26, 2002).

25. *Bryan v. Moore*, 863 A.2d 258, 260 (Del.Ch. 2004) (" 'Generally time is not of the essence in suits to specifically enforce a contract for the sale of land' and will not be of the essence unless it is specifically stated in the contract.") (quoting *Butzke v. Beach Homes, Inc.*, 1984 WL 159380, at *2 (Del.Ch. Apr. 2, 1984)).

26. *See* WILLISTON ON CONTRACTS § 67:15 (2009) ("A prospective purchaser is not able to perform ... for purposes of obtaining specific performance, when funds from third parties are needed to make the purchase, and those parties are not bound to furnish the money. A purchaser will be deemed ready and able to perform, by contrast, and the contract will be specifically enforced, where the agreement is subject to financing, and the purchaser is able to obtain it.").

27. *Morabito*, 2002 WL 550117, at *2.

28. *Szambelak v. Tsipouras*, 2007 WL 4179315, at *7 (Del.Ch. Nov.19, 2007) (quoting *Walton v. Beale*, 2006 WL 265489, at *7 (Del. Ch. Jan. 30, 2006)); *see also Morabito*, 2002 WL 550117, at *2 ("The balance of equities issue 'reflect[s] the traditional concern of a court of equity that its special processes not be used in a way that unjustifiably increases human suffering.' ") (quoting *Bernard Pers. Consultants, Inc. v. Mazarella*, 1990 WL 124969, at *3 (Del.Ch. Aug. 28, 1990)).

29. If you add the $50,000 payment ordered by the Vice Chancellor and the $66,000 which was the total payment of $275 a month for twenty years this equals the $116,000.

did not pay increased rent. Fourth, Osborn paid all, and Kemp did not pay any, of the property taxes for twenty years. Finally, the Vice Chancellor erred by not taking into account the appreciation value of the property and the interest that would have accumulated when he held that the balance of equities tipped in favor of awarding specific performance.

While Gillespie has made a robust argument, the balance of the equities tips in favor of Kemp and specific performance. We recognize that real property is unique and often the law cannot adequately remedy a party's refusal to honor a real property contract.[30] We also take note of the improvements that Kemp made to the property that cost him approximately $11,000. If we add this to the Vice Chancellor's $116,000 purchase price, then the $127,000 total amount further tips the scales against Gillespie's proffered property that sold for $106,000 in 1986. Osborn not only received an income stream for twenty years, but she also used the first floor of the property for her personal use over the course of the contract. Osborn indisputably benefited from this arrangement.

 We do not discount that beach front property has appreciated over the span of twenty years, however, the "mere increase in land values, unaccompanied by other circumstances showing inequity, is not such hardship as justifies a court of equity in denying specific performance."[31]

Finally, and most importantly, Kemp and Danburg lived in this property for twenty years. They made it their home. Equity would not be served by ousting Kemp and Danburg from their long-time residence.[32]

In sum, we affirm the order for specific performance because the parties validly executed a contract; the party seeking specific performance is ready, willing, and able to perform under the contract; and the balance of equities tips in favor of specific performance.

### 2. The Doctrine of Laches

 Gillespie next contends that the Vice Chancellor erred when he held that the doctrine of laches did not bar Kemp's petition for specific performance. "[L]aches generally requires the establishment of three things: first, knowledge by the claimant; second, unreasonable delay in bringing the claim, and third, resulting prejudice to the defendant."[33] While the doctrine of laches does not prescribe a specific time bar to determine reasonableness, we traditionally have taken into account the legal statute of limitations when assessing whether the party unreasonably delayed bringing suit.[34] The analogous statute of limitations in this action is three years.[35]

We hold that Kemp did not unreasonably delay bringing this suit. Under the terms of the agreement, Kemp completed performance on April 16, 2005. Kemp testified that he informed Osborn in August

**30.** *Szambelak,* 2007 WL 4179315, at *7 ("Real property is unique; thus, specific performance of a real estate sale contract is often the only adequate remedy for a breach by the seller, except in rare circumstances.").

**31.** *Cunningham v. Esso Standard Oil Co.,* 118 A.2d 611, 614 (Del.1955).

**32.** *Morabito,* 2002 WL 550117, at *3 (holding that a family would experience significant hardship because an order of specific performance cast the family out of their home and render them homeless).

**33.** *Reid v. Spazio,* 970 A.2d 176, 182–83 (Del. 2009) (quoting *Homestore, Inc. v. Tafeen,* 888 A.2d 204, 210 (Del.2005)).

**34.** *Id.* at 183.

**35.** 10 *Del. C.* § 8106.

2005 that he had completed performance and asked her to transfer title to the property. Osborn never transferred title, but because of their close personal relationship and course of dealing over twenty years, Kemp had no reason to believe that he would not receive the deed at some point. When Gillespie assumed Osborn's affairs, in August 2006, she requested that Kemp renew paying rents. Kemp responded in January 2007 by asserting his ownership interest in the property.

These facts indicate a continued, albeit lethargic, series of actions taken by Kemp to assert his ownership interest in the property. Kemp twice asserted his ownership interest in the property and eventually furnished a copy of the installment contract. Therefore, Gillespie has failed to show that Kemp unreasonably delayed bringing this action.

## III. CONCLUSION

For the aforementioned reasons we **AFFIRM** the judgment of the Court of Chancery. The parties shall follow the Vice Chancellor's order of specific performance as outlined in his opinion of August 20, 2009.