**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| FLEX LTD. and FLEXTRONICS INTERNATIONAL USA, INC., <br><br> Plaintiffs, <br><br> v. <br><br> NEXTRACKER INC., NEXTRACKER LLC, YUMA ACQUISITION SUB LLC and YUMA SUBSIDIARY, INC., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | C.A. No. 2025-0197-KSJM |

**MEMORANDUM OPINION**

Date Submitted: October 20, 2025
Date Decided: January 21, 2026

Oderah C. Nwaeze, Angela Lam, FAEGRE DRINKER BIDDLE & REATH LLP, Wilmington, Delaware; Lawrence G. Scarborough, FAEGRE DRINKER BIDDLE & REATH LLP, New York, New York; Jacob A. Kramer, FAEGRE DRINKER BIDDLE & REATH LLP, Washington, D.C.; Desmonne A. Bennett, FAEGRE DRINKER BIDDLE & REATH LLP, Denver, Colorado; *Counsel for Plaintiffs Flex Ltd. and Flextronics International USA, Inc.*

Kevin M. Coen, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Brian M. Burnovski, DAVIS POLK & WARDWELL LLP, New York, New York; *Counsel for Defendants Nextracker Inc., Nextracker LLC, Yuma Acquisition Sub LLC, and Yuma Subsidiary, Inc.*

**McCORMICK, C.**

This dispute concerns tax liabilities incurred before the plaintiffs spun off Nextracker LLC. Before the spin-off, Nextracker made quarterly distributions under to the LLC agreement to its members in amounts calculated to cover the members' tax liabilities. Flex Ltd. owned Nextracker's members, and Flex would cause the members to transfer the quarterly distributions up the corporate chain to Flex. Flex incurred tax liabilities for Nextracker's earnings during the quarter right before the spin-off. After the spin-off, Flex demanded payment from Nextracker to cover those liabilities. Nextracker refused. Flex filed this suit for breach of contract to force payment. Flex's primary claim is that Nextracker's refusal to pay amounts equal to Flex's tax liabilities violates the wrong-pockets and retained-assets provisions of the separation agreement governing the spin-off. But Flex ignores the more specific language of a tax agreement entered to facilitate the spin-off, which allocates the tax liabilities at issue to Flex. The defendants have moved to dismiss the complaint based on the plain language of the suite of agreements, and this decision grants the motion.

## I. FACTUAL BACKGROUND

The facts are drawn from the Verified Complaint (the "Complaint") and the documents it incorporates by reference.[1]

### A. Flex Acquires Nextracker.

Plaintiff Flex Ltd. is a Singaporean company. It owns plaintiff Flextronics International USA Inc. ("Flex USA" and with Flex Ltd., "Flex" or "Plaintiffs"). Flex USA is responsible for U.S. income taxes for itself and its subsidiaries.

---

[1] C.A. 2025-0197, Docket ("Dkt.") 1 ("Compl.").

Flex acquired Nextracker in December 2015 for approximately $330 million. Nextracker provides solar tracking and software solutions to utility-scale solar projects around the world. Its products allow solar panels to follow the sun's movement, optimizing utility-scale plant performance.

## B.     Flex Prepares To Spin-Off Nextracker.

In 2021, Flex considered a full or partial separation from Nextracker through an IPO, sale, spin-off, or other transaction. On February 1, 2022, Nextracker and Flex entered into a Separation Agreement. At that time, Flex owned Yuma Acquisition Sub LLC and Yuma Subsidiary, Inc. (the "Yuma Members"). The Yuma Members held membership interests in an operating entity, Nextracker LLC (with Nextracker Inc. and the Yuma Members, "Defendants"). Nextracker LLC operates pursuant to a Third Amended and Restated Limited Liability Company Agreement (the "LLC Agreement"). Nextracker Inc. was formed as a Flex subsidiary to serve as a publicly traded entity. Nextracker Inc. is also Nextracker LLC's managing member.

In February 2023, Nextracker and Flex executed an Agreement and Plan of Merger and an Amended and Restated Separation Agreement (the "Separation Agreement").[2] The Separation Agreement governed the Nextracker spin-off. Under the Separation Agreement and related contracts, Flex had discretion to choose when to spin-off Nextracker.

---

[2] *Id.* ¶ 26.

Two aspects of the Separation Agreement are relevant to the parties' dispute. Section 2.4(b) of the Separation Agreement is a "Wrong-Pockets Provision."[3] That provision requires that each party return any mistaken payments after the spin-off. Sections 2.2, 2.6, and 2.8 collectively establish "Retained-Assets Provisions" identifying the assets that Flex would retain after the spin-off.[4]

In 2022 and 2023, Flex executed several transactions to begin its divestment of Nextracker. In February 2022, it sold $500 million of convertible preferred equity in Nextracker LLC to a third party. In February 2023, it completed an IPO of its shares in Nextracker Inc. In July 2023, Nextracker Inc. completed a follow-on offering, leaving Flex with 51.5% of the total outstanding shares of Nextracker Inc. common stock.

### C.    Nextracker Makes Tax Distributions To The Yuma Members.

Meanwhile, Nextracker Inc. made tax distributions to the Yuma Members. Nextracker LLC is treated as a partnership for federal income tax purposes, which means that its taxable income "passes through" to the Yuma Members. Flex USA, through its ownership of the Yuma Members, is ultimately responsible for paying taxes on Nextracker's income.

---

[3] Compl., Ex. A (Separation Agreement) § 2.4(b).

[4] *Id.* §§ 2.2, 2.6, 2.8.

Both Nextracker and Flex operate with a fiscal year ending in March.[5] Each quarter, Nextracker LLC made tax distributions to the Yuma Members, and Flex USA caused the Yuma Members to transfer the funds to Flex USA, the entity responsible for U.S. tax payments. This procedure occurred in Q4 2023, Q1 2024, and Q2 2024.[6]

### D. Flex Finalizes The Spinoff.

Flex spun-off Nextracker on January 2, 2024. The spin-off involved a two-step merger where (1) Yuma Inc. merged with a wholly owned corporate subsidiary of Nextracker (and Yuma Inc. survived), and then (2) Yuma Inc. merged into an LLC wholly owned by Nextracker (Yuma Acquisition Sub, which survived).

That same day, the parties executed a Tax Matters Agreement (the "Tax Agreement").[7] The Tax Agreement allocated tax responsibilities between Nextracker and Flex and contained provisions governing which party could receive refunds. It also protected the transaction's tax-free status.

### E. The Q3 2024 Tax Distribution

The tax distribution for Q3 2024 was due on January 10, 2024, but Nextracker LLC delayed it until February 6, 2024, when it distributed $48.5 million to the Yuma

---

[5] The first quarter ran from April 1 to June 30, the second quarter ran from July 1 to September 30, the third quarter ran from October 1 through December 31, and the fourth quarter ran from January 1 to March 31.

[6] Compl. ¶¶ 50, 125.

[7] Dkt. 16, Ex. E (Tax Agreement). The court may consider the Tax Agreement because it is incorporated by reference in the Complaint. *See* Compl. ¶ 45 n.1 (citing Nextracker Inc.'s Form S-4 dated October 25, 2023, which attaches as an exhibit a form of the Tax Matters Agreement that is materially identical to the final version of the agreement); Dkt. 16, Ex. A.

4

Members (the "Q3 Tax Distribution"). Because Flex no longer controlled the Yuma

Members, it could not force those entities to send the payment up the corporate chain.

Flex thus demanded that Defendants pay it the Q3 Tax Distribution, which

covered the period before the spin-off during which Flex earned approximately $167

million through its ownership of Nextracker LLC. Defendants refused to pay the Q3

Tax Distribution to Flex.

**F.     This Litigation**

Plaintiffs filed this action against Defendants on February 21, 2025, asserting

four counts:

- In Count I, Plaintiffs claim that Nextracker Inc. breached the Wrong Pockets and Retained Assets Provisions of the Separation Agreement by failing to forward the Q3 Tax Distribution to Flex.

- In Count II, asserted in the alternative against Nextracker Inc., Plaintiffs claim breach of the implied covenant of good faith and fair dealing.

- In Count III, asserted in the alternative against Nextracker Inc. and Nextracker LLC, Plaintiffs seek to reform the Separation Agreement based on theories of unilateral and mutual mistake.

- In Count IV, asserted in the alternative against Nextracker Inc. and the Yuma Members, Plaintiffs claim that Nextracker Inc.'s failure to forward the Q3 Tax Distribution unjustly enriched Nextracker Inc. and the Yuma Members.[8]

---

[8] Compl. ¶¶ 97–142.

On March 25, 2025, Defendants moved to dismiss the Complaint.[9] The parties concluded briefing on July 31, 2025, and the court held oral argument on October 20, 2025.[10]

## II.    LEGAL ANALYSIS

Defendants moved to dismiss the Complaint for failure to state a claim under Court of Chancery Rule 12(b)(6). "[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[11] When considering a Rule 12(b)(6) motion, the court must "accept all well-pleaded factual allegations in the [c]omplaint as true . . . , draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[12] The court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[13]

### A.    Breach Of Contract

Plaintiffs claim that Nextracker Inc. breached the Wrong-Pockets Provision and Retained-Assets Provision by refusing to pay them the Q3 Tax Distribution.

---

[9] Dkt. 13.

[10] *See* Dkts. 16, 19, 22, 29.

[11] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[12] *Id.* (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[13] *Price v. E.I. du Pont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011), *overruled on other grounds by Ramsey v. Georgia S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1277 (Del. 2018) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

To prevail on a claim for breach of contract, a party must demonstrate the existence of a contract, the breach of an obligation imposed by that contract, and harm or damage resulting from the breach.[14]

Defendants dispute that they committed a breach, arguing that the Q3 Tax Distribution falls outside the Wrong-Pockets and Retained Assets Provisions. And even if it does not, Defendants argue that the Tax Agreement forecloses liability because it governs the Q3 Tax Distribution.

Delaware courts follow the objective theory of contracts, giving words "their plain meaning unless it appears that the parties intended a special meaning."[15] In practice, the objective theory requires that a court "give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[16] "In so doing, the court evaluates the relevant provision's semantics, syntax, and context, aided by interpretive canons."[17]

Where language is unambiguous, courts "will give effect to the plain meaning of the contract's terms and provisions."[18] "Language is ambiguous if it is susceptible

---

[14] *See VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

[15] *Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 104 (Del. 2013).

[16] *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (internal quotation marks omitted).

[17] *JJS, Ltd. v. Steelpoint CP Hldgs., LLC*, 2019 WL 5092896, at *5 (Del. Ch. Oct. 11, 2019).

[18] *Manti Hldgs., LLC v. Authentix Acq. Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021) (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159–60 (Del. 2010)).

to more than one reasonable interpretation."[19] "An interpretation is unreasonable if it 'produces an absurd result' or a result 'that no reasonable person would have accepted when entering the contract.'"[20] "The parties' steadfast disagreement over interpretation will not, alone, render the contract ambiguous."[21]

### 1. The Wrong-Pockets Provision

The Wrong-Pockets Provision states:

> As between the Parties (and the members of their respective Group) all *payments and reimbursements* received after the Operative Time by one Party (or member of its Group) that *relate to* a[n] . . . *Asset or Liability* of the other Party (or member of its Group), shall be held by such Party for the use and benefit of the Party entitled thereto (at the expense of the Party entitled thereto) and, promptly upon receipt by such Party of any such payment or reimbursement, such Party shall pay . . . the amount of such payment or reimbursement without right of set-off.[22]

This provision has two key parts. It requires that Nextracker pay to Flex the amount of: (a) "all payments and reimbursements" received by Nextracker or its affiliates that "relate to" an (b) "Asset" or "Liability" of Flex.[23]

Nextracker disputes Plaintiffs' interpretation of these provisions and further argues that the Wrong-Pockets Provision must be read in harmony with the Tax Agreement.

---

[19] *Id.* (citing *Osborn*, 991 A.2d at 1160).

[20] *Id.* (quoting *Osborn*, 991 A.2d at 1160).

[21] *Id.*

[22] Separation Agreement § 2.4(b) (emphases added).

[23] *Id.*

8

### a. Payments And Reimbursements

The LLC Agreement does not define "payment" or "reimbursement." "Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract."[24] Black's Law Dictionary defines "payment" as "[t]he money or other valuable thing so delivered in satisfaction of an obligation."[25] It defines "reimbursement" as "[t]he act or an instance of paying back a sum of money."[26]

Under these definitions, the Q3 Tax Distribution is at least a payment. Nextracker made the Q3 Tax Distribution under Section 5.01(b) of the LLC Agreement. That provision states:

> To the extent (i) [Nextracker Inc.] reasonably determines that [Nextracker LLC] has Available Cash . . . [Nextracker Inc.] shall cause [Nextracker LLC] to make distributions for each Tax Year (or portion thereof) among the Common Members with respect to their Common Units pro rata . . . such that each Common Member receives an amount at least equal to the excess of (A) the product of (x) the aggregate net taxable income for such Tax Year allocated by the Company to such Common Member (disregarding any basis adjustments pursuant to Section 743(b) of the Code), and (y) the Assumed Tax Rate for such Tax Year, over (B) all prior distributions made to such Common Member in such Tax Year with respect to its Common Units (to the extent not previously taken into account under this Section 5.01(b)). Any distribution made pursuant to this Section 5.01(b) shall be treated as an advance against future distributions payable to such Member pursuant to Section 5.01(a) or Article XIII and shall reduce such distributions on a dollar-for-dollar basis.

---

[24] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006).

[25] *Payment*, Black's Law Dictionary (12th ed. 2024).

[26] *Reimbursement*, Black's Law Dictionary (12th ed. 2024).

> [Nextracker Inc.] shall cause [Nextracker LLC] to make distributions pursuant to this Section 5.01(b) in quarterly installments on an estimated basis on or before the 10th day of April, July, October and January of such Tax Year.[27]

The language and structure of the provision reflect the parties' intent to pay LLC members for their tax liability. It is titled "Tax Distributions."[28] It repeats the word "distribution" several times. And it uses tax inputs to calculate distributions. The LLC Agreement takes a conservative approach, ensuring members will not receive less than their actual tax liability by defining "Assumed Tax Rate" as "equal to the highest marginal income tax rate."[29] Plus, the quarterly distribution requirement is timed to match the members' quarterly tax liability. The Q3 Tax Distribution thus meets the definition of a "payment" because Nextracker LLC "delivered [it] in satisfaction of an obligation"—the corresponding Q3 2024 tax liability.[30]

Defendants argue that the Q3 Tax Distribution was neither a payment nor reimbursement, but an advance or loan. They rely on the second half of Section 5.01(b), which treats tax distributions as an "*advance* against future distributions payable to such Member pursuant to Section 5.01(a) or Article XIII" and states that tax distributions "shall reduce such distributions on a dollar-for-dollar basis."[31]

---

[27] Compl., Ex. B (LLC Agreement) § 5.01(b).

[28] *Id.*

[29] *Id.* § 1.01.

[30] *Payment*, Black's Law Dictionary (12th ed. 2024).

[31] LLC Agreement § 5.01(b) (emphasis added).

10

But even if the Q3 Tax Distribution did qualify as an advance or loan, it could still be a "payment." The terms are not mutually exclusive. When money is lent or advanced, it is still delivered to satisfy an obligation. The Q3 Tax Distribution, therefore, qualifies as a "payment" under the Separation Agreement.

### b. Asset Or Liability

The Separation Agreement defines "Asset" as:

> all *rights* (including Intellectual Property), title and ownership interests in and to all properties, claims, Contracts, businesses, or assets (including goodwill), wherever located (including in the possession of vendors or other third parties or elsewhere), of every kind, character and description, whether real, personal or mixed, tangible or intangible, whether accrued, contingent or otherwise, in each case, whether or not recorded or reflected on the books and records or financial statements of any Person.[32]

To argue that the Q3 Tax Distribution constitutes an Asset under this definition, Plaintiffs assert that they had a "right" to payment under the LLC Agreement for the period of time through January 2, 2024. This argument fails because Plaintiffs did not have a right to tax distributions under the LLC Agreement. The Yuma Members held a right to receive tax distributions, not Plaintiffs. Plaintiffs had no "right" to the Q3 Tax Distribution.

Although the Q3 Tax Distribution does not relate to a Flex "Asset," it does relate to a Flex "Liability." The Separation Agreement defines "Liability" to include "liabilities" and "Taxes" as follows:

> any and all Indebtedness, liabilities, costs, expenses, Taxes, interest and obligations, whether accrued or fixed,

---

[32] Separation Agreement § 1.1(8) (emphasis added).

11

absolute or contingent, matured or unmatured, known or unknown, reserved or unreserved, or determined or determinable, including those arising under any Law (including Environmental Law), Action, whether asserted or unasserted, or order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Entity and those arising under any Contract or any fines, damages or equitable relief which may be imposed and including all costs and expenses related thereto.[33]

The Separation Agreement defined "Taxes" as "all taxes, charges, fees, duties, levies . . . of any kind imposed by any federal, state, local or non-United States Taxing Authority. . . ."[34]

Flex alleges that the Yuma Members earned approximately $167 million through Flex's ultimate ownership of Nextracker LLC in Q3 2024. And through its ownership of the Yuma Members, Flex USA is responsible for paying taxes on that income. That tax liability is a "Liability" because it falls under the embedded "Taxes" definition. It is a tax charge or fee imposed by a government authority.[35]

The Q3 Tax Distribution also "relate[s] to" the "Liability" on $167 million of income. Under Delaware law, "relate to" is "paradigmatically broad."[36] "It captures anything that touches on the subject."[37]

---

[33] Separation Agreement § 1.1(89).

[34] *Id.* § 1.1(154).

[35] *See id.*

[36] *Exit Strategy, LLC v. Festival Retail Fund BH, L.P.*, 2023 WL 4571932, at *12 (Del. Ch. July 17, 2023), *aff'd*, 326 A.3d 356 (Del. 2024) (quoting *Fla. Chem. Co. v. Flotek Indus.*, 262 A.3d 1066, 1083 (Del. Ch. 2021)).

[37] *Id.* (internal quotation marks omitted).

The Q3 Tax Distribution relates to Taxes and liabilities. As discussed above, the language and structure of the LLC Agreement's Section 5.01(b) makes clear that the Q3 Tax Distribution corresponds to the tax liability on $167 million of income.[38]

Defendants argue that the taxable income is allocated only to the Yuma Members, not Flex. As a result, Flex did not incur a "Liability." The parties did not brief the intricacies of U.S. tax law. The Complaint, however, does allege that "[b]ecause Flex USA was the parent of the consolidated group that included [the Yuma Members] during Q3 2024, Flex USA was liable for the quarterly pass-through tax liability arising from the membership interests in Nextracker LLC owned by [the Yuma Members] during that quarter."[39] Accepting this allegation as true, it is reasonably conceivable that plaintiff Flex USA incurred the tax liability associated with Nextracker LLC's Q3 2024 income.

The Q3 Tax Distribution is thus a payment that relates to a Liability covered by the Wrong-Pockets Provision. If the analysis ended here, the court would deny the motion to dismiss. But there is more to consider.

### c. The Tax Agreement

Defendants argue that the court must read the Separation Agreement and the Tax Agreement together and that specific provisions of the Tax Agreement defeat Plaintiffs' claims.

---

[38] *Exit Strategy*, 2023 WL 4571932, at *12; *see supra* Section II.A.1(a).

[39] Compl. ¶ 6.

Under Delaware law, "multiple documents evidencing the same transaction must be construed together."[40] Documents evidence the same transaction when they are executed at the same time, concern the same subject matter, and have similar parties.[41]

The court must read the Separation Agreement and Tax Agreement together. The parties did not sign the Separation Agreement at the same time as the Tax Agreement. But that is because the parties structured the Separation Agreement to give Flex the discretion to choose when it would execute the spin-off.[42] The parties executed the Tax Agreement on January 2, 2024, the same day Flex chose to spin-off Nextracker under the Separation Agreement. And the Tax Agreement was entered to facilitate the spin-off. This is evident from the recitals of the Tax Agreement, which state its two objectives: "to (a) provide for the payment of Tax liabilities and entitlement to refunds thereof, allocate responsibility for, and cooperation in, the filing of Tax Returns, and . . . (b) set forth certain covenants and indemnities relating

---

[40] *Segovia v. Equities First Hldgs., LLC*, 2008 WL 2251218, at *9 (Del. Super. Ct. May 30, 2008).

[41] *See Crown Books Corp. v. Bookstop, Inc.*, 1990 WL 26166, at *1 (Del. Ch. Feb. 28, 1990) ("[I]n construing the legal obligations created by [a] document, it is appropriate for the court to consider not only the language of that document but also the language of contracts among the same parties executed or amended as of the same date that deal with related matters[.]"); *see also Martin Marietta Mat'ls, Inc. v. Vulcan Mat'ls Co.*, 56 A.3d 1072, 1120 & n.192 (Del. Ch.), *aff'd*, 68 A.3d 1208 (Del. 2012), *as corrected* (July 12, 2012) (collecting authorities on interpreting multiple agreements).

[42] Separation Agreement § 3.7 ("Flex shall, in its sole and absolute discretion, determine (i) whether to proceed with all or part of the [spin-off].")  Flex executed the spin-off on January 2, 2024—the date it entered into the Tax Agreement. Compl. ¶ 7; Tax Agreement.

14

to the preservation of the Tax-Free Status of the [spin-off]."[43] The Tax Agreement further notes that "[c]apitalized terms used and not defined herein shall have the respective meanings set forth in the Separation Agreement[.]"[44] And in several areas, the Tax Agreement references the definitions the Separation Agreement uses.[45] Plus, the agreements involve nearly identical parties.[46] The parties thus intended for the Tax Agreement to facilitate the Separation Agreement.

Given the timing of, terms of, and parties to the Tax Agreement, it is evident that either the Tax Agreement modified the Separation Agreement or is intended to be read together with that agreement. Either way, the court must consider its terms to resolve Defendants' motion to dismiss, evaluating the contractual scheme in a manner that harmonizes their provisions.

"[T]o harmonize two agreements, a court may find it necessary to give primacy to one agreement when there is a dispute."[47] "The new contract, as a general matter, will control over the old contract with respect to the same subject matter to the extent that the new contract is inconsistent with the old contract or if the parties expressly agreed that the new contract would supersede the old one."[48] Additionally, "[s]pecific

---

[43] Tax Agreement at 1.

[44] *Id.*

[45] *See, e.g.*, *id.* § 1.1(23) ("'Flex Retained Business' shall have the meaning set for in the Separation Agreement.").

[46] Flex Ltd., Nextracker Inc., and Yuma Inc. are the Tax Agreement parties. *Id.* at 1. Flex Ltd., Nextracker Inc., Nextracker LLC, and Flextronics International USA, Inc. are the Separation Agreement parties. Separation Agreement at 1.

[47] *Karish v. SI Int'l, Inc.*, 2002 WL 1402303, at *3 (Del. Ch. June 24, 2002).

[48] *Country Life Homes, Inc. v. Shaffer*, 2007 WL 333075, at *5 (Del. Ch. Jan. 31, 2007).

language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one."[49]

The provisions of the Tax Agreement control the parties' dispute. The Tax Agreement is more specific than the Separation Agreement as to the matters it addresses. Section 2.1, titled "Tax Relating to Joint Returns," allocates "Taxes" for specifically defined tax periods.[50] Section 2.1(a) expressly allocates to Flex responsibility "for any and all Taxes" before the January 2, 2024 spin-off, including Flex's Q3 2024 tax liabilities associated with its ownership of Nextracker.[51] In contrast, the Wrong-Pockets Provision speaks in general transaction terms, using "payment," "reimbursement," "Asset," and "Liability." Because this case concerns the Q3 Tax Distribution related to tax liabilities on $167 million of income, the tax-specific language of the Tax Agreement controls. And Flex cannot claim a right to payment for a liability it expressly allocated to itself under the Tax Agreement.

Section 2.6 of the Tax Agreement further supports the primacy of the Tax Agreement. The provision broadly terminates "all prior Tax sharing or allocation agreements or practices between" the parties.[52] For three quarters, Flex alleges it caused the Yuma Members to pay quarterly tax distributions to Flex USA. That is a "practice" that Section 2.6 terminated.

---

[49] *DCV Hldgs., Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005).

[50] Tax Agreement § 2.1.

[51] *Id.* § 2.1(a).

[52] *Id.* § 2.6.

16

Flex argues that the Tax Agreement is consistent with the Wrong-Pockets Provision because the Q3 Tax Distribution is a "Refund." Under Section 2.5(a) of the Tax Agreement, "Flex shall be entitled to all Refunds related to Taxes the liability for which is allocated to Flex. . . ."[53] The Tax Agreement defines Refund as "any refund, reimbursement, offset, credit, or other similar benefit in respect of Taxes. . . ."[54] The Tax Agreement defines Taxes as charges imposed by government authorities.[55] A refund thus would arise when a government entity, like the IRS, pays Nextracker for Taxes Flex already paid. In that case, Flex would receive a Refund. But that is not the case here because the Q3 Tax Distribution does not arise from a payment to a federal, state, local, or any other government agency. It arises from the Yuma Members, which Flex no longer controls. The Q3 Tax Distribution is not a "Refund" under the Tax Agreement.

In light of the Tax Agreement, Flex has failed to state a claim for breach of the Separation Agreement under the Wrong-Pockets Provision.

---

[53] *Id.* § 2.5(a).

[54] *Id.* § 1.1(64).

[55] *Id.* § 1.1(75) (defining Taxes as "all taxes, charges, fees, duties, levies, imposts, rates or other assessments or governmental charges of any kind in the nature of a tax imposed by any federal, state, local or non-United States Taxing Authority. . ."). The Separation Agreement contains an identical definition. *See* Separation Agreement § 1.1 (154) (defining Taxes as "all taxes, charges, fees, duties, levies, imposts, rates or other assessments or governmental charges of any kind imposed by any federal, state, local or non-United States Taxing Authority. . .").

## 2. The Retained-Assets Provisions

Flex repackages its argument that the Q3 Tax Distribution is an Asset it should receive under the Separation Agreement. Section 2.2 of the Separation Agreement instructs Nextracker to transfer the Flex Retained Assets to Flex.[56] The Separation Agreement defines "Flex Retained Assets" as "any and all Assets that are expressly contemplated by this Agreement or any Ancillary Agreement as Assets to be retained by [Flex]. . . ."[57] Flex Retained Assets thus include Assets from Ancillary Agreements.[58] Plaintiffs argue that the Q3 Tax Distribution is an Asset under an Ancillary Agreement, the LLC Agreement.

This theory fails for the same reason the Wrong-Pockets Provision does not apply. As described above, the parent company does not have a right to the Q3 Tax distribution. The Yuma Members do. And Plaintiffs lost the ability to force the Yuma Members to send up tax distributions when they chose to execute the spin-off on January 2, 2024. The Retained-Assets Provisions thus do not support Plaintiffs' claim to the Q3 Tax Distribution.

Count I fails to state a claim and is dismissed.

---

[56] *Id.* § 2.2.

[57] Separation Agreement § 1.1(61)(i).

[58] *Id.* § 1.1(61)(i).

18

## B.   Breach Of The Implied Covenant

To state a claim for breach of the implied covenant, a plaintiff must "allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff."[59]

Plaintiffs plead their implied covenant claim in the alternative and only make the claim to "the extent Flex's (or its subsidiaries') entitlement to the Q3 Tax Distribution is not deemed to be explicitly, implicitly, or otherwise set forth in the Separation Agreement[.]"[60]

There is no implied obligation.  The plain language of the parties' contractual scheme covers this issue.  Plaintiffs have failed to state a claim for breach of the implied covenant of good faith and fair dealing because there is no gap in the parties' contractual scheme for the covenant to fill.

Count II fails to state a claim and is dismissed.

## C.   Mistake

Again, Plaintiffs plead Count III in the alternative.  This time, they make this pleading to "the extent the Q3 Tax Distribution is not deemed a 'payment or reimbursement.'"[61]

"The Courts of this State have always insisted in reformation cases on a showing of mutual mistake or, in appropriate cases, unilateral mistake on plaintiff's

---

[59] *Fitzgerald v. Cantor*, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998).

[60] Compl. ¶ 111.

[61] *Id.* ¶ 121.

part coupled with knowing silence on defendant's part."[62]  The party seeking reformation must have the "ability to show, by clear and convincing evidence, that despite the existing written agreement one party maintains is accurate, that existing writing erroneously expresses the parties' true agreement."[63]  "Unless there was a clear understanding with which the formal contract conflicts, there is, of course, no comparative standard upon which to base a reformation, and the contract as executed must stand."[64]  "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."[65]  "Rule 9(b) requires the pleading to inform the opposing party of the precise transaction at issue and the fraud or mistake alleged to have occurred in the transaction so as to notify the opposing party of its precise alleged misconduct."[66]

This claim falters for lack of any particularized allegations reflecting that the contractual scheme was the product of mutual mistake.

Count III fails to state a claim and is dismissed.

### D.    Unjust Enrichment

In Count IV, Plaintiffs make an unjust enrichment claim "[i]f  the Separation Agreement is deemed not to govern Flex's (or its subsidiaries') entitlement to the Q3

---

[62] *Collins v. Burke*, 418 A.2d 999, 1002 (Del. 1980).

[63] *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Est. Fund*, 68 A.3d 665, 680 (Del. 2013).

[64] *Hob Tea Room v. Miller*, 89 A.2d 851, 857 (Del. 1952).

[65] Ct. Ch. R. 9(b).

[66] *James River-Pennington Inc. v. CRSS Cap., Inc.*, 1995 WL 106554, at *9 (Mar. 6, 1995).

Tax Distribution. . . ."[67]  Under this alternative theory, Plaintiffs allege that Defendants were enriched because they retained the Q3 Tax Distribution despite not incurring the associated tax liability.

To state a claim for unjust enrichment, Flex must show: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, and (4) the absence of justification.[68]

Plaintiffs meet the first three elements.  The Q3 Tax Distribution enriched Defendants.  Plaintiffs did not receive the Q3 Tax Distribution.  And the Q3 Tax Distribution relates to the associated tax liability Plaintiffs incurred due to their ownership of Nextracker during Q3 2024.

But Plaintiffs fail on the fourth element because the LLC Agreement and Tax Agreement gives Defendants a clear justification.  Under Section 5.01(b) of the LLC Agreement, the members of Nextracker LLC receive tax distributions.[69]  Nextracker Inc. made the Q3 Tax Distribution to the Yuma Members.  The Tax Agreement allocated tax liabilities thereafter.  Defendants' delay of the Q3 Tax Distribution until February 6, 2024 is irrelevant to Plaintiffs because it did not affect their rights.

Count IV fails to state a claim and is dismissed.

## III.  CONCLUSION

Defendants' motion to dismiss is granted.

---

[67] *Id.* ¶ 135.

[68] *Garfield ex rel. ODP Corp. v. Allen*, 277 A.3d 296, 341–51 (Del. Ch. 2022).

[69] LLC Agreement § 5.01(b).